Matthew C. Williams
ID Bar No. 6271
WILLIAMS LAW, PLLC
812 First St. S.
Nampa, ID 83651
Telephone: (208) 908-6066
matt@williamslawoffice.net


*Counsel for Plaintiffs*

* *Pro Hac Vice application forthcoming*

Tyson C. Langhofer*
VA Bar No. 95204
Michael R. Ross*
TN Bar No. 35304
Mathew W. Hoffmann*
DC Bar No. 1617417
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
tlanghofer@ADFlegal.org
mross@ADFlegal.org
mhoffmann@ADFlegal.org

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
### CENTRAL DIVISION

| | |
|---|---|
| **PETER PERLOT, MARK MILLER,** and **RYAN ALEXANDER**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **C. SCOTT GREEN**, President of the University of Idaho, **BRIAN ECKLES**, Dean of Students, **ERIN AGIDIUS**, Director of the Office of Civil Rights & Investigations, and **LINDSAY EWAN**, Deputy Director of the Office of Civil Rights and Investigations, all individually and all in their official capacities, <br><br> *Defendants.* | Civil Case No.: <br><br><br> **VERIFIED COMPLAINT** <br> **Jury Trial Demanded** |

1

## PLAINTIFFS' VERIFIED COMPLAINT

Plaintiffs, for their Verified Complaint against Defendants, state the following:

### INTRODUCTION

1.   It is unconstitutional for the government to punish a private speaker because of the speaker's motivating ideology, opinion, or perspective, or because of the content of that speaker's expression. This prohibition against viewpoint and content discrimination applies fully to public universities.

2.   The University of Idaho has failed to abide by this fundamental, clearly established principle because it has enforced its anti-harassment policies to punish students based on the content and viewpoint of those students' protected speech.

3.   On April 1, 2022, the University of Idaho College of Law in Moscow, Idaho held a "moment of community" in response to an anti-LGBTQ+ slur that was left on a whiteboard at the University's Boise campus.

4.   Members of the Christian Legal Society ("CLS") chapter at the College of Law gathered at the "moment of community" to condemn the slur and to publicly support and pray in solidarity with their fellow students at the University.

5.   But while they were there, a student approached them and asked why the chapter required its officers to affirm the belief that marriage is between one man and one woman.

6.   One CLS member respectfully explained that the chapter requires this because it is the only view of marriage and sexuality affirmed in the Bible.

7.   Soon after, a second CLS member left a handwritten note for the student and told her that he would be happy to discuss this further with her so that they could both fully be heard and better understand one another's views.

8.   The next Monday, April 4, this student and several others publicly denounced CLS's actions at a panel with the American Bar Association. The student even said that one of the CLS students told her to go to hell, which was untrue.

9.   A third CLS member attended that meeting and explained that these statements were inaccurate, that the biggest discrimination he had seen on campus was the discrimination against CLS and its religious beliefs, and that he was concerned about the state of religious freedom on campus.

10.   Three days later, all three of these CLS members received no-contact orders from the University's Office of Civil Rights and Investigations. The orders prohibit any communication between Plaintiffs and another student. The CLS members did not receive notice that anyone had complained about them and were not given an opportunity to review the allegations against them or defend themselves.

11.   Instead of allowing the students to disagree civilly and respectfully with one another and to discuss these important issues, the University chose instead to censor Plaintiffs.

12.   The University issued these no-contact orders under their Title IX Sexual Harassment Policy and their Code of Conduct and Disciplinary Policies.

13.   But the University has applied these Policies to the students because of their protected speech, not any conduct.

14.   The University has also applied these Policies to the students because the University deemed the content of their speech controversial and because their viewpoints are disfavored or unpopular.

15.   These actions violate the students' clearly established rights under the First Amendment's Free Speech Clause.

16.   Further, the University's Policies and their application of those Policies also violate the students' clearly established rights to exercise their religious beliefs under the First Amendment, to procedural due process, and to religious exercise under Idaho's Free Exercise of Religion Protected Act.

17.   These three students now sue as Plaintiffs and are entitled to their requested declaratory, injunctive, and monetary relief.

## JURISDICTION & VENUE

18.   Plaintiffs sue under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments to the United States Constitution and under Idaho Code § 73-402 for violations of Idaho's Free Exercise of Religion Protected Act.

19.   Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201–02 and Federal Rule of Civil Procedure 57, injunctive relief under 42 U.S.C. § 1343 and Federal Rule of Civil Procedure 65, damages under 42 U.S.C. § 1343 and Idaho Code § 73-402(4), and reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and Idaho Code § 73-402(4).

20.   This Court has original jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over state claims under 28 U.S.C. § 1367.

21.   This Court also has jurisdiction under 28 U.S.C. § 1343 because Plaintiffs seek to recover damages and equitable relief under 42 U.S.C. § 1983.

22.   Venue is proper in this district and division under 28 U.S.C. § 1391(b) and Dist. Idaho Loc. Civ. R. 3.1 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district and because Defendants reside in this district and division.

## PLAINTIFFS

23.   Plaintiffs Peter Perlot, Mark Miller, and Ryan Alexander are students at the University of Idaho College of Law (the "Law School") and are officers or members of the Law School's Christian Legal Society.

24.   Plaintiff Perlot is a third-year law student and the President of CLS.

25.   Plaintiff Miller is a second-year law student and an active member of CLS.

26.   Plaintiff Alexander is a first-year law student and the 1L Representative of CLS.

27.  Plaintiffs are professing Christians.

28.  Plaintiffs' religious beliefs include that God created the institution of marriage to unite one man and one woman.

29.  Plaintiffs are motivated by their sincerely held religious beliefs to share the Gospel of Jesus Christ and to speak on campus on many topics from a Christian worldview.

30.  Plaintiffs believe that their on-campus speech is a way to share the Gospel with non-Christians and a way to disciple and equip other Christians on campus to grow and mature in their faith.

### DEFENDANTS

31.  Defendant C. Scott Green is the President of the University of Idaho (the "University").

32.  The Idaho State Board of Education has appointed Defendant Green to be "the chief program and administrative officer" for the University of Idaho and given Green "full power and responsibility . . . for the organization, management, direction, and supervision" of the University and "all of its units, divisions, and services." Ex. 1 (Idaho State Board of Education Governing Policies and Procedures, Section I.E.2.a).

33.  The Idaho State Board of Education has authority to delegate this power under Idaho Code § 33-107(4)(c).

34.  Defendant Green directly oversees the University's Office of Civil Rights and Investigations. Ex. 2 (University Organization Chart).

35.  Defendant Green knows or should know that the challenged University Policies unconstitutionally regulate student speech and have been applied unconstitutionally to Plaintiffs' speech. Although Defendant Green knows this, he has not amended or repealed those Policies or taken any other corrective action as to their application here.

36.   Defendant Green is sued for declaratory and injunctive relief in his official capacity and for damages in his individual capacity.

37.   Defendant Eckles is the Vice Provost for Student Affairs and the Dean of Students.

38.   As the Dean of Students, Mr. Eckles oversees all aspects of student discipline, including any discipline for students who violate the Student Code of Conduct. Ex. 3 (Office of the Dean of Students and Student Conduct webpages).

39.   Defendant Eckles knows or should know that the challenged University Policies unconstitutionally regulate student speech and have been applied unconstitutionally to Plaintiffs' speech. Although Defendant Eckles knows this, he has not amended or repealed those Policies or taken any other corrective action as to their application here.

40.   Defendant Eckles is sued for declaratory and injunctive relief in his official capacity and for damages in his individual capacity.

41.   Defendant Erin Agidius is the Director of the Office of Civil Rights and Investigations for the University.

42.   As Director, Defendant Agidius oversees all aspects of the Office of Civil Rights and Investigations, including "training, education and investigation of complaints." Ex. 4 (Office of Civil Rights & Investigations, "Meet Our People").

43.   Defendant Lindsay Ewan is the Deputy Director of the Office of Civil Rights and Investigations for the University.

44.   As Deputy Director, Defendant Ewan "supervises and directs the work of the civil rights investigators in the course of investigations involving students and employees." *Id.*

45.   Defendants Agidius and Ewan know or should know that the challenged University Policies unconstitutionally regulate student speech. Although Defendants Agidius and Ewan know this, they have not amended or repealed those Policies or

6

taken any other corrective action as to their application here.

46. Defendants Agidius and Ewan have unconstitutionally applied the challenged Policies to censor Plaintiffs' speech.

47. Defendants Agidius and Ewan are sued for declaratory and injunctive relief in their official capacities and for damages in their individual capacities.

48. Each of the acts and Policies alleged in this Complaint are and were attributed to Defendants who have acted and continue to act under color of a statute, regulation, or custom of the State of Idaho.

FACTUAL ALLEGATIONS

## I.   Defendants' challenged Policies

49. The University's Office of Civil Rights and Investigations (the "Office of Civil Rights") and Dean of Students implement and enforce several nondiscrimination Policies.

50. The University's Title IX Sexual Harassment Policy (the *Title IX Policy*), along with the Student Code of Conduct and the Disciplinary Process for Alleged Violations of Student Code of Conduct (together the *Conduct and Discipline Policies*), prohibit different types of harassment and discriminatory behavior.

### A. The Title IX Policy

51. The University's *Title IX Policy* requires the Office of Civil Rights to issue various interim measures, including no-contact orders, in response to complaints about sexual harassment.

52. The University recently updated its *Title IX Policy* in January 2022 to be consistent with federal regulations regarding Title IX. Ex. 5 (Policy 6100 – Title IX Sexual Harassment); *see* 34 C.F.R. §§ 106.30–.46.

53. The University's Policy prohibits "sexual harassment," which it defines to include "conduct on the basis of sex" that is "determined by a reasonable person to be

so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity." Ex. 5 at 3, Sec. D-19.b.

54.    If a student reports sexual harassment, the Policy *requires* the Office of Civil Rights to immediately "[i]mplement appropriate supportive measures for both the respondent and the complainant. Supportive measures may be implemented with or without the filing of a formal complaint." *Id.* at 4, Sec. E-1.b.

55.    "Supportive measures" include "[m]utual restrictions on contact between the parties." *Id.*, Sec. E.1.b.1(e).

56.    The Policy does not require the Office of Civil Rights to determine that sexual harassment occurred or likely occurred.

57.    The Policy does not require Defendants to give notice or a hearing to the respondent before issuing these so-called "supportive measures."

58.    The Policy does not require Defendants to find that sexual harassment is likely to occur in the future.

59.    The Policy does not provide for any appeal of "supportive measures" Defendants impose such as no-contact orders.

60.    Moreover, the Office of Civil Rights "has sole authority to determine what supportive measures are to be implemented." *Id.* at 5, Sec. E.1.b.2.

**B. The Conduct and Discipline Policies**

61.    Similarly, the *Conduct and Discipline Policies* prohibit several types of harassing and discriminatory behaviors and grants the Office of Civil Rights and Dean of Students wide latitude to investigate and issue "interim action" they deem fit.

62.    As relevant here, the Policies prohibit four types of behavior:

   a.  "Persistent or severe, verbal abuse, threats, intimidation, harassment, coercion, bullying, derogatory comments, vandalism, or other conduct

8

that threatens or endangers the mental or physical health or safety of any person or causes reasonable apprehension of such harm. A single instance may be considered severe enough to merit sanctions."

b.  "Sexual harassment, which . . . includes, but is not limited to, unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct or communication of a sexual nature when . . . [s]uch conduct is sufficiently severe or pervasive as to have the effect of creating an intimidating, hostile or offensive educational environment or negatively affecting a student's educational opportunities. A single instance may be considered severe enough to merit sanctions."

c.  "Gender-based and sexual orientation harassment . . . which is defined as any act of verbal, non-verbal, or physical aggression, intimidation, or hostility based on sex, sex-stereotyping, gender, or gender-stereotyping, even if those acts do not involve conduct of a sexual nature."

d.  "Discrimination" based on "race, color, national origin, religion, sex, sexual orientation, gender identity/expression, age, disability or status as a Vietnam-era veteran."

Ex. 6 at 4–5 (Policy 2300 – Student Code of Conduct); Ex. 7 (Policy 3200 – Policy of Nondiscrimination); Ex. 8 (Policy 3215 – Non-Discrimination on the Basis of Sexual Orientation and Gender Identity/Expression).

63.  The *Discipline Policy* authorizes Defendants to take any necessary "interim action" for actual or potential violations of any of the prohibitions in the *Code of Conduct*, including the prohibitions above. Ex. 9 at 10, Sec. H (Policy 2400 – University Disciplinary Process for Alleged Violations of Student Code of Conduct).

64.  On information and belief, Defendants interpret the *Discipline Policy* to allow "interim action" even if a formal complaint is not filed.

65.  The authorized "interim action" includes "[i]ssuance of a no-contact order." *Id.* Sec. H-4.b.

66.  The *Discipline Policy* does not require Defendants to determine that the *Conduct Policy* was violated or likely violated.

67.   The *Discipline Policy* does not require Defendants to give notice or a hearing to a respondent before issuing a no-contact order, *id.*, Sec. H-2, and even states that "[a] no-contact order should be routinely issued in Title IX cases." *Id.*, Sec. H.3.

68.   The *Discipline Policy* does not require Defendants to find that there is a risk of future violations before issuing a no-contact order.

69.   In fact, the *Discipline Policy* exempts the issuance of no-contact orders from any factual finding of future harm. *Id.*, Sec. H-2.

70.   Similarly, in Title IX cases, Defendants' *Discipline Policy* exempts the issuance of a no-contact order from any "specific determination" that future harm is likely to occur. *Id.*, Sec. H-3.

71.   Defendants' *Discipline Policy* allows an appeal of a no-contact order only to the same officer that issued the order. *Id.* at 11, Sec. H-7.

72.   Defendants provide "no formal procedures for this appeal." *Id.*, Sec. H-7.

73.   During the pendency of the appeal, the no-contact order "remain[s] in effect." *Id.*, Sec. H-7.

## II.   Defendants punish Plaintiffs for defending Christian Legal Society's religious beliefs.

74.   Defendants have applied their *Title IX Policy* and *Conduct and Discipline Policies* against each of the Plaintiffs based on Plaintiffs' religious speech.

### A.   Plaintiffs went to great efforts to get the University to approve their Christian Legal Society chapter.

75.   Plaintiff Miller and several other students founded the University's Christian Legal Society chapter in the Fall of 2021.

76.   The Christian Legal Society is "a fellowship of Christians dedicated to serving Jesus Christ through the practice and study of law, the defense of religious freedom and life, and the provision of legal aid to the needy." *About Us*, Christian

Legal Society, https://www.christianlegalsociety.org/about (last visited Apr. 20, 2022).

77.    CLS has over 54 chapters of practicing attorneys and 120 chapters of law students across the country. Christian Legal Society, Annual Report 2020, at 27–28, https://www.christianlegalsociety.org/sites/default/files/site_files/AnnualReport_202 0_low.pdf (last visited Apr. 20, 2022).

78.    The chapter's Constitution specifically states that "[a]ll officers must also affirm the CLS Community Life Statement and agree to operate the Chapter under its principles." Ex. 10 at 2 (CLSUI Chapter Constitution).

79.    The CLS Community Life Statement provides in part: "We renounce unbiblical behaviors, including deception, malicious speech, drunkenness, drug abuse, stealing, cheating, and other immoral conduct such as using pornography and engaging in sexual relations other than within a marriage between one man and one woman." Ex. 11 (CLS Community Life Statement).

80.    The Community Life Statement also contains other traditional and well-known Christian beliefs, including the following:

a.   "We believe that the Bible, God's written word, is the ultimate guide for our values, attitudes, and behaviors";

b.   "We seek to respect the uniqueness of all people, including our differences in race, sex, ethnicity, and talents, for each bear's God's image";

c.   "We acknowledge that every person has engaged in attitudes and behaviors that fall short of God's standards, and we rejoice in God's forgiveness to all repentant believers"; and

d.   "We acknowledge the Biblical mandate to treat all persons with love and respect, even if we disagree over these values, attitudes, and behavior."

*Id.*

81.    Plaintiff Miller and the students attempted to register their own CLS chapter at the beginning of the school year but were continually delayed by the law school's student government body.

82.    Several students, including members of the student government, expressed disapproval of the chapter because its Constitution requires officers to affirm that marriage is between one man and one woman.

83.    During two separate sessions, the student government debated whether they would allow CLS to require its leaders to hold beliefs consistent with CLS' mission and purpose.

84.    Additionally, several CLS officers also received emails from other students objecting to CLS' religious beliefs. One student stated that CLS's religious belief "is an invalidation of someone's very existence who is a LGBTQ person" and that he has "been spreading word about this issue to other students because I believe many do not know about it and would find it concerning as I have." Ex. 12 (Email, "Concerning Actions by the Christian Legal Society").

85.    Because of the hostility towards CLS' religious beliefs, the Dean of the law school had to intervene and approve the chapter in November 2021.

86.    The chapter has a faculty advisor who teaches at the Law School.

87.    Since then, the chapter has met weekly to hold Bible studies and has about ten regular members.

88.    The chapter also regularly holds events open to all law students. In the Fall of 2021, it hosted a speaker to discuss church law. And on April 20, 2022, it jointly hosted a panel on religious liberty with the law school's Federalist Society and ACLU chapters.

**B. Plaintiffs Perlot and Miller are approached by another law student to question their group's religious beliefs.**

89.    On April 1, 2022, the law school held a "moment of community" in response to an incident at the Boise campus.

90.    Law school Dean Johanna Kalb emailed all law students and explained that someone wrote a derogatory slur directed at the LGBTQ+ community on a classroom whiteboard at the Boise campus. Ex. 13 at 1 (Emails from Deans regarding Moment of Community).

91.    Her email also reiterated the need to "disagree and debate, while also caring for and respecting each other." *Id.*

92.    She also stated,

> I want to be very clear that I expect and hope that our classrooms and hallways will be a place of robust discussion and debate. In every place I've worked, including here, I have had the great fortune to discuss and learn from faculty, staff, and students whose views differ from my own. I have made mistakes and learned from them, and I've grown and changed as a result, as a person and as a lawyer. The foundation for all of these discussions is mutual respect and grace. Bullying is not a conservative or a liberal value, and I will do everything in my power to stop it.

*Id.*

93.    The law school's associate deans sent a follow up email inviting everyone who has ever "felt marginalized or excluded" or who "just want[s] to show support for those who have" to participate in a "moment of community" on the front steps of the law school buildings on each campus. *Id.* at 1.

94.    Plaintiffs Perlot and Miller, along with most of the other CLS members and their faculty advisor, desired to participate in this event to denounce the slur and marginalization of any members of the community.

95.    Plaintiff Alexander was unable to attend the event because he was ill.

96.     When they arrived the morning of the event, Plaintiffs Perlot and Miller and about eight other members of CLS formed a circle on the steps in front of the law school and began praying.

97.     As prayer continued, about 30 other individuals who were not part of CLS also joined the gathering.

98.     One of those individuals was the subject of the no-contact orders against Plaintiffs. To respect her privacy, Plaintiffs refer to her as Ms. Doe.[1]

99.     After the prayer ended, Ms. Doe asked the CLS members why the CLS constitution states that marriage is between one man and one woman.

100.    Mr. Miller responded that this requirement is based on a biblical view of marriage and sexuality.

101.    Ms. Doe responded that she did not think the Bible supported that belief.

102.    Mr. Miller explained that the Bible defines marriage between a man and a woman in several places and that it condemns homosexuality, just like every other sin.

103.    Ms. Doe did not say anything further to Mr. Miller or any other CLS members, and their conversation concluded at that point.

104.    In this conversation, Mr. Miller and Ms. Doe civilly and respectfully expressed their disagreement with one another.

105.    Other attendees at the event, including some faculty members, also witnessed the conversation.

106.    After the event, Plaintiff Perlot left a handwritten note for Ms. Doe at her desk when she was not present. The note invited her to come to a CLS event or to talk with him if he wanted to have more discussion about that issue or to learn more about CLS.

---

[1] Plaintiffs have also redacted Ms. Doe's name and other unnecessary personally identifying information from the exhibits to the Complaint.

107.  Plaintiff Perlot did this because he thought that a one-on-one conversation would allow both he and Ms. Doe an opportunity to be fully heard and better understand one another's views.

108.  Several other members of the campus community expressed hostility toward Plaintiffs even though Plaintiffs civilly and respectfully explained their beliefs and even though they did so in response to a direct question about those beliefs.

109.  The following Monday, on April 4, several students staged walkouts for two of the classes taught by the CLS faculty advisor.

110.  Another professor placed a sign on her office door that reads "I stand with our LGBTQI+ students, staff, and faculty and everyone who has experienced discrimination at this law school. At this public university your personal religious beliefs are not an excuse to deprive others of their rights under the law." Ex. 14 (Sign Posted by Professor).

111.  The president of the Law School's student government also condemned Plaintiffs' religious beliefs in a Facebook post. He stated that he was "sickened and saddened" by what CLS did and that "[w]hat was meant to be a showing of love and support devolved into proselytizing." Ex. 15 (Facebook Post).

112.  He also stated that "[p]reaching that marriage is between a man and a woman is beyond the pale" but begrudgingly affirmed that the CLS students were "within [their] constitutional rights" to pray and talk at the event. *Id.*

113.  On information and belief, Defendants have not restricted the speech of or otherwise punished the professor or any of the students who engaged in the above expression.

**C. Plaintiff Alexander and other students defend the Christian Legal Society at a subsequent event.**

114.  The Monday after the event, the Law School hosted members of the accreditation panel of the American Bar Association (the "ABA").

15

115.   Before the ABA arrived, the Law School told all of the students that there would be an ABA panel for the students on April 4 to talk about any concerns that the students had.

116.   Plaintiffs Alexander and Perlot and 3 other CLS members attended the event.

117.   At the panel, several students, including Ms. Doe, stated that certain students from the Christian Legal Society had religious beliefs that were bigoted and anti-LGBTQ+.

118.   Ms. Doe even stated that she had personally experienced instances of bigotry and that some students in the room had told her to go to hell.

119.   None of the Plaintiffs have ever told Ms. Doe to go to hell.

120.   After the other students made their comments, Plaintiff Alexander spoke up and explained that Ms. Doe is the one who initiated the conversation on April 1 and that the biggest instance of discrimination was actually the delay in registering CLS last fall.

121.   Plaintiff Alexander also stated that the CLS members just wanted to live in a manner consistent with their religious beliefs and that he was concerned about the state of religious freedom on campus.

122.   Plaintiff Alexander said nothing further at the event. Neither Plaintiff Alexander nor Plaintiff Perlot spoke with Ms. Doe directly during or after the ABA panel.

### D. The University issues no-contact orders against Plaintiffs because of their religious expression.

123. That same day, April 4, Defendant Ewan interviewed Plaintiff Miller about the events that happened during the "moment of community" on April 1. In that interview, Mr. Miller explained what happened and how his conversation with Ms. Doe proceeded.

16

124. Defendant Ewan told Mr. Miller that he was not in trouble and that she was simply trying to understand what happened on April 1.

125. During the interview, Defendant Ewan also stated that Title IX allowed her office to provide "supportive measures to those in need" and asked Plaintiff Miller to keep this in mind in case he or any of his colleagues were feeling anxious or concerned about attending classes after the events on April 1.

126. Then on April 7, each of the Plaintiffs received a no-contact order issued by Defendant Ewan. Exs. 16, 17, & 18.

127. The orders prohibit each of the Plaintiffs from having any contact with Ms. Doe and are substantively identical.

128. The orders prohibit Plaintiffs from "contacting Ms. Doe in any way, from this point forward, and until otherwise notified," and "under any circumstances."

129. The orders say contact "can be defined as, but is not limited to": "[w]ritten," "[v]erbal," "[e]lectronic," and "[n]on-[v]erbal" communication, including mail, letters, text messages, telephone, voicemail, in person, email, social media, skype, pictures, videos, or music.

130. The orders further mandate that Plaintiffs "sit on opposite sides of the room" from Ms. Doe during any courses they may have with her.

131. Plaintiffs must first obtain permission from the Office of Civil Rights if they believe they have a "legitimate reason" to contact Ms. Doe.

132. The orders warn that the Office of Civil Rights "may be in contact with you regarding other measures that may need to be taken as a result of this no-contact order." These actions may include class schedule adjustments, residence hall restrictions, or on campus work schedule adjustments.

133. The orders apply both on- and off-campus.

134. The orders do not have a termination date. *Id.*

135. The orders state that even classroom interaction with Ms. Doe must first be

17

approved by the Office of Civil Rights and "shall pertain only to relevant academic work being discussed." *Id.*

136. The orders state that "[a]ny action deemed to be in violation of this no-contact order will be taken seriously and considered retaliation. Further action may be taken by this administration as a result, which could include suspension or expulsion." *Id.*

137. The orders also state that Ms. Doe has received a similar no-contact order prohibiting her from contacting any of the Plaintiffs.

138. Defendants did not conduct any investigation regarding Plaintiffs Perlot and Alexander, present any factual findings or witnesses to any Plaintiff, or give any Plaintiff an opportunity to respond to the complaints against them before the Office of Civil Rights issued the orders.

139. Defendant Ewan admitted to Plaintiff Perlot that "[n]o investigation has occurred" and "no facts have been determined." Ex. 19 (Follow-up emails between Perlot and Defendant Ewan).

140. In fact, Defendants did not even contact Plaintiffs Alexander or Perlot before issuing these orders.

141. Rather, Defendants told Plaintiff Perlot that they issued the no-contact order because it "was requested by [Ms. Doe] and deemed reasonable based on the information presented." *Id.*

142. The no-contact orders do not specify the reason the orders were issued.

143. On information and belief, Defendants issued the no-contact order against Plaintiff Miller because he responded to Ms. Doe's questions about CLS' religious beliefs at the "moment of community" on April 1.

144. On information and belief, Defendants issued the no-contact order against Plaintiff Perlot because of the note he left Ms. Doe after the "moment of community" offering to speak with her further if she so desired.

145. On information and belief, Defendants issued the no-contact order against

18

Plaintiff Alexander because of his comments defending CLS' religious beliefs at the ABA meeting on April 4.

146. On information and belief, Defendants issued these no-contact orders under the *Conduct and Discipline Policies* and the *Title IX Policy*.

**E. Plaintiffs are suffering ongoing harm from the no-contact orders.**

147. Because of these orders, all Plaintiffs credibly fear that Defendants will sanction Plaintiffs or issue other no contact orders if Plaintiffs express their religious beliefs, even if they do so in direct response to a question asking what their beliefs are and why they hold those beliefs.

148. Defendants' no-contact orders have inflicted great stress and anxiety on Plaintiffs.

149. Plaintiffs fear that any expression of their sincerely held religious beliefs will run afoul of Defendants' interpretation of their Policies.

150. Plaintiffs worry what they can and cannot say on campus without running afoul of Defendants' Policies.

151. Plaintiffs therefore have self-censored on campus when expressing their religious beliefs and other beliefs that some may disagree with.

152. Before speaking, Plaintiffs weigh how other students will receive their speech and whether their speech will prompt those students to complain to Defendants.

153. Plaintiffs must also contend with the constant fear that Defendants may issue future no-contact orders on the basis of their protected speech at any time and without prior notice or process.

154. Plaintiff Alexander is the same year as Ms. Doe and currently has four classes with her. He is worried about addressing or responding to Ms. Doe or even Ms. Doe's statements or ideas in these classes, and is concerned that Defendants may deem his seat not on the "opposite side[ ] of the room" and therefore in violation of the order.

19

155. Before the April 4 event, Plaintiff Alexander had only made cordial small talk with Ms. Doe and had not engaged in any lengthy discussion with her.

156. Before the April 1 incident, Plaintiffs Miller and Perlot had never engaged in conversation with Ms. Doe.

157. Plaintiffs also suffer stress and anxiety from the future consequences of Defendants' no-contact orders.

158. Plaintiffs are all in law school and intend to apply for admission to the bar so that they can practice law.

159. Bar applications often ask questions relating to discipline by academic institutions.

160. A disciplinary record from an academic institution could jeopardize admission to the bar.

161. For example, Idaho's application for admission to the bar asks whether an applicant has "ever been investigated, suspended, expelled, or disciplined, formally or informally, by any school, college, or university."

162. At the very least, Defendants' no-contact orders signal an investigation and may constitute informal discipline.

163. Plaintiffs thus credibly fear that Defendants' no-contact orders may endanger their future careers and cause them to have diminished earning potential.

164. Plaintiffs have observed that the University allows students to discuss almost any content with each other, whether in the classroom, in the hallways, or elsewhere on or off campus.

165. Indeed, the Law School Dean even emphasized this in her email announcing the "moment of community": "I expect and hope that our classrooms and hallways will be a place of robust discussion and debate." Ex. 13.

166. Plaintiffs have also observed that the University allows, and even promotes, students who express viewpoints on sexuality and marriage opposed to their own,

20

including those who have expressly condemned Plaintiffs' and CLS' views on sexuality.

167. Plaintiffs attempted to resolve this dispute without court intervention.

168. On April 8, Mr. Langhofer, counsel for the Plaintiffs, spoke with the University's general counsel, James E. M. Craig.

169. Mr. Langhofer explained that the no-contact orders violated Plaintiffs' First Amendment rights because they were issued based on the content and viewpoint of Plaintiffs' religious speech. Mr. Langhofer further explained that the no-contact orders violated Plaintiffs' due process rights because the University had conducted no investigation and issued the orders without any formal or even informal hearing.

170. Over the following two weeks, Mr. Langhofer communicated multiple times with the University's counsel through email and telephone.

171. Unfortunately, the University refused to rescind the no-contact orders. The University insisted that Title IX authorizes the University to issue these no-contact orders as supportive measures solely because Ms. Doe disagreed with Plaintiffs' expression of their religious beliefs.

172. As a result, Plaintiffs were forced to file this lawsuit.

### FIRST CAUSE OF ACTION
### First Amendment: Freedom of Speech
### (42 U.S.C. § 1983)

173. Plaintiffs repeat each of the allegations in paragraphs 1–172.

174. The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment, prohibits censorship of religious expression.

175. Private student expression is protected by the First Amendment.

176. A University cannot restrict a student's private expression based on either its content or its viewpoint unless that restriction serves a compelling governmental interest and is narrowly tailored to that interest.

177. Defendants here have censored Plaintiffs based on the content and viewpoint of their speech.

178. Plaintiffs' expression, including at the "moment of community" event and the ABA panel, is protected speech under the First Amendment.

179. Pursuant to their *Title IX Policy* and *Conduct and Discipline Policies*, Defendants issued no-contact orders that singled out Plaintiffs' expression and prevented them from engaging in religious expression with Ms. Doe.

180. Defendants' no-contact orders have also chilled Plaintiffs from engaging in religious expression with other students at the Law School or the rest of the University.

181. Defendants have thus censored Plaintiffs based on Plaintiffs' religious views and on the content of their speech.

182. Defendants allow speech between students on a wide variety of content. Nor have Defendants censored students who express views on sexuality and marriage opposed to Plaintiffs' views, including speech expressly condemning Plaintiffs and CLS.

183. Defendants' censorship does not serve any compelling government interest, nor is it narrowly tailored to any such interest.

184. In addition to the fact that it is not a content-neutral restriction, Defendants' no-contact order is unconstitutional because it is not narrowly tailored to serve a significant government interest and does not leave open ample alternative channels of communication.

185. Defendants' *Title IX Policy* and *Conduct and Discipline Policies* also violate the First Amendment's Free Speech Clause because they grant Defendants unbridled discretion to restrict protected speech.

186. By permitting Defendants to issue no-contact orders without first requiring them to find an actual violation of these Policies and without providing notice and a

hearing to the respondent, Defendants have license to issue no-contact orders against views or content they deem controversial or unpopular.

187. Further, Defendants can issue no-contact orders for an indefinite duration and have discretion to restrict different types of content or viewpoints in the no-contact orders themselves.

188. Defendants' no-contact orders and the *Title IX Policy* and *Conduct and Discipline Policies* that authorize them also violate the First Amendment's Free Speech Clause because they are unconstitutional prior restraints on speech.

189. Defendants cannot justify the no-contact orders under strict scrutiny. Nor can Defendants justify them as a content-neutral regulation under intermediate scrutiny.

190. Defendants also cannot justify the *Title IX Policy* and *Conduct and Discipline Policies* to the extent that they authorize no-contact orders that are issued solely on a student's expressive activity because the Policies are overbroad, impose prior restraints, and grant unbridled discretion.

191. Defendants' *Conduct and Discipline Policies* also violate the First Amendment's Free Speech Clause because they are facially overbroad.

192. Defendants' definition of harassment, sexual harassment, and gender-based and sexual orientation harassment reaches a substantial amount of constitutionally protected speech.

193. By defining harassment or sexual harassment to include even "[a] single instance" of verbal conduct and defining gender-based and sexual orientation harassment to include "any act of verbal . . . aggression, intimidation, or hostility," the University can punish virtually any protected expression as harassment.

194. The overbreadth of the *Conduct and Discipline Policies* chills Plaintiffs' speech.

195. To the extent that Defendants issued the no-contact orders based on any of

these types of harassment or potential harassment, Defendants have unconstitutionally discriminated against Plaintiffs under these Policies because Plaintiffs engaged in protected expression.

196. Defendants' *Conduct and Discipline Policies* and their enforcement of those Policies are therefore unconstitutionally overbroad and violate Plaintiffs' free speech rights under the First Amendment's Free Speech Clause.

197.  Defendants' *Title IX Policy* and *Conduct and Discipline Policies*, both facially and as applied, violate the Free Speech Clause of the First Amendment.

198. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

**SECOND CAUSE OF ACTION**
**First Amendment: Free Exercise of Religion**
**(42 U.S.C. § 1983)**

199. Plaintiffs repeat each of the allegations in paragraphs 1–172.

200.  Plaintiffs are motivated by their sincerely held religious beliefs to speak on campus on many topics from a Christian worldview. Plaintiffs believe their on-campus speech is a way to share the Gospel of Jesus Christ with non-Christians and a way to disciple and equip other Christians on campus to grow and mature in their faith.

201. The First Amendment's Free Exercise Clause guarantees religious believers–at a bare minimum—equal treatment.

202. A public university policy that burdens religious exercise and is not both neutral and generally applicable must satisfy strict scrutiny.

203. And a public university policy that targets religious beliefs is never permissible.

204. Defendants' application of their *Title IX Policy* and *Conduct and Discipline Policies* burdens religious exercise because Defendants apply these Policies to exclude

24

certain religious viewpoints.

205. These Policies, as applied, are not neutral or generally applicable.

206. Rather, Defendants have specifically targeted Plaintiffs' speech on sexuality and marriage because of the religious views Plaintiffs expressed at the "moment of community" and the ABA panel.

207. Defendants' application of their *Title IX Policy* and *Conduct and Discipline Policies* does not support a compelling government interest and is not narrowly tailored to any such interest.

208. Defendants' application of these Policies thus violates the Free Exercise Clause of the First Amendment.

209. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

### THIRD CAUSE OF ACTION
### Fourteenth Amendment Right to Due Process of Law
### (42 U.S.C. § 1983)

210. Plaintiffs repeat each of the allegations in paragraphs 1–172.

211. Before a public university can discipline a student, procedural due process requires at a minimum that the student be given notice and an opportunity for a hearing before an impartial tribunal.

212. By issuing no-contact orders against Plaintiffs and threatening penalties for violating those orders, Defendants disciplined them for their religious speech.

213. But Defendants, pursuant to the *Title IX Policy* and *Discipline Policy*, did not give notice or an opportunity for a hearing before an impartial tribunal to any of the Plaintiffs.

214. Nor did Defendants set a hearing after the no-contact orders were issued to determine whether the keep the orders in place after a certain point.

215. In fact, the no-contact orders remain in place indefinitely unless the Office of

Civil Rights orders otherwise.

216. Defendants have thus violated Plaintiffs' right to procedural due process under the Fourteenth Amendment.

217. Additionally, by punishing and threatening to punish Plaintiffs under vague and overbroad Policies for their expression, Defendants have violated and are violating Plaintiffs' right to due process of law under the Fourteenth Amendment.

218. Defendants' no-contact orders and *Title IX Policy* and *Conduct and Discipline Policies* are unconstitutionally vague.

219. Defendants' no-contact orders, *Title IX Policy,* and *Conduct and Discipline Policies* utilize terms that are inherently subjective and elude any precise or objective definition that would be consistent from one official, professor, or student to another, because they are incapable of providing meaningful guidance to Defendants and other University officials, and because they force Plaintiffs to guess whether expression that the First Amendment protects is in fact allowed on campus.

220. The no-contact orders fail to define such terms as "approach," "any attempt to communicate with them in any form," "sit on opposite sides of the room," and "legitimate reason to contact."

221. Defendants' *Title IX Policy* and *Conduct and Discipline Policies* fail to define any criteria for the imposition of no-contact orders and fail to employ safeguards to ensure Defendants do not issue no-contact orders on the basis of even a single instance of protected speech.

222. Defendants' *Conduct and Discipline Policies* fail to define terms such as "verbal abuse," "verbal . . . conduct or communication," "act of verbal . . . aggression, intimidation, or hostility," "sexual orientation," "gender identity/expression," and "[a] single instance may be considered severe enough to merit sanctions."

223. Defendants' *Title IX Policy* and *Conduct and Discipline Policies* are also unconstitutionally vague because they grant University officials unbridled discretion

26

in deciding when to issue no-contact orders.

224. The lack of objective criteria, factors, or standards in Defendants' no-contact orders, *Title IX Policy*, and *Conduct and Discipline Policies* renders the no-contact orders and Policies unconstitutionally vague and in violation of Plaintiffs' right to due process of law.

225. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm, and are entitled to an award of monetary damages and equitable relief.

### FOURTH CAUSE OF ACTION
### Idaho Free Exercise of Religion Protected Act
### (Idaho Code § 73-402)

226. Plaintiffs repeat each of the allegations in paragraphs 1–172.

227. Idaho's Free Exercise of Religion Protected Act states that the "government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government shows that the application of the burden is "[e]ssential to further a compelling governmental interest" and is "[t]he least restrictive means of furthering that compelling governmental interest." Idaho Code § 73-402(2)–(3).

228. Plaintiffs are motivated by their sincerely held religious beliefs to speak on campus on many topics from a Christian worldview. Plaintiffs believe their on-campus speech is a way to share the Gospel of Jesus Christ with non-Christians and a way to disciple and equip other Christians on campus to grow and mature in their faith.

229. Defendants' application of the *Title IX Policy* and *Conduct and Discipline Policies* burdens religious exercise because Defendants apply these Policies to exclude certain religious viewpoints.

230.  This prevents Plaintiffs from freely sharing their Christian viewpoints on a number of topics with others at the Law School and thus substantially burdens Plaintiffs' religious exercise.

231. Defendants' application of their *Title IX Policy* and *Conduct and Discipline Policies* does not support a compelling governmental interest and is not the least restrictive means of furthering any such compelling governmental interest.

232.  Defendants' application of these Policies thus violates Idaho's Free Exercise of Religion Protected Act.

233.  Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm.

234.  Plaintiffs seek only damages, costs, and attorney's fees against Defendants in their individual capacities under the Idaho Free Exercise of Religion Protected Act.

### PRAYER FOR RELIEF

Thus, Plaintiffs respectfully request that this Court:

A.  Enter a judgment declaring that Defendants' no-contact orders, *Title IX Policy,* and *Conduct and Discipline Policies*, facially and as-applied, violate Plaintiffs' rights under the First Amendment and Fourteenth Amendment;

B.  Enter a preliminary and permanent injunction ordering Defendants sued in their official capacities, including their agents, officials, servants, employees, and any other persons acting on their behalf, to (1) stop enforcing the no-contact orders and their *Title IX Policy* and *Conduct and Discipline Policies* against protected expression, whether through formal discipline, "interim action," "supportive measures," or in any other way; (2) terminate any investigation related to the no-contact orders issued to Plaintiffs based on allegations of protected speech alone; and (3) remove any reference to the no-contact orders and investigations related to the no-contact orders in the University's records for Plaintiffs;

28

C. Award compensatory damages for the reputational harm and emotional harm and distress Defendants have caused Plaintiffs;

D. Award nominal damages for the violation of Plaintiffs' constitutional and statutory rights;

E. Award Plaintiffs' reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and Idaho Code § 73-402(4); and

F. Award any other relief to which Plaintiffs may be entitled.

Respectfully submitted this 25th day of April, 2022.

*/s/ Matthew C. Williams*

Matthew C. Williams
ID Bar No. 6271
WILLIAMS LAW, PLLC
812 First St. S.
Nampa, ID 83651
Telephone: (208) 908-6066
matt@williamslawoffice.net

Tyson C. Langhofer*
VA Bar No. 95204
Michael R. Ross*
TN Bar No. 35304
Mathew W. Hoffmann*
DC Bar No. 1617417
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
tlanghofer@ADFlegal.org
mross@ADFlegal.org
mhoffmann@ADFlegal.org

*Counsel for Plaintiffs*

**Pro Hac Vice application forthcoming.*

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury for all issues so triable.

*/s/ Matthew C. Williams*

Matthew C. Williams
*Counsel for Plaintiffs*

## DECLARATION UNDER PENALTY OF PERJURY

I, Mark J. Miller_____, a citizen of the United States and a resident of the State of Idaho, declare under penalty of perjury under 28 U.S.C. § 1746 that the above is true and correct to the best of my knowledge.

Executed this 21 day of April, 2022, at 7:02 , AM (PT).
Moscow, Idaho

Mark James Miller
Mark Miller

30

## DECLARATION UNDER PENALTY OF PERJURY

I, _Peter Perlot_ a citizen of the United States and a resident of the State of

_Idaho_ , declare under penalty of perjury under 28 U.S.C. § 1746 that the above

is true and correct to the best of my knowledge.

Executed this 25th day of April, 2022, at Moscow, Idaho.

Plaintiff Peter Perlot

**DECLARATION UNDER PENALTY OF PERJURY**

I, <u>Ryan James Alexander</u>, a citizen of the United States and a resident of the State of Idaho, declare under penalty of perjury under 28 U.S.C. § 1746 that the above is true and correct to the best of my knowledge.

Executed this <u>20th</u> day of April, 2022, at <u>Moscow</u>, <u>Idaho</u>.

Ryan Alexander

32