LAWRENCE G. WASDEN
Attorney General
State of Idaho
Office of the Attorney General

KATHARINE B. BRERETON, ISBA #9583
kbrereton@lclattorneys.com
PETER C. ERBLAND, ISBA #2456
perbland@lclattorneys.com
LAKE CITY LAW GROUP PLLC
435 W. Hanley Avenue, Suite 101
Coeur d'Alene, ID  83815
Telephone: (208) 664-8115
Facsimile: (208) 664-6338

*Attorney for Defendants*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PETER PERLOT, MARK MILLER, and RYAN ALEXANDER,<br><br>Plaintiffs,<br><br>v.<br><br>C. SCOTT GREEN, President of the University of Idaho, BLAINE ECKLES, Dean of Students, ERIN AGIDIUS, Director of the Office of Civil Rights & Investigations, and LINDSAY EWAN, Deputy Director of the Office of Civil Rights and Investigations, all individually and all in their official capacities.<br><br>Defendants. | Case No. 3:22-cv-00183-DCN<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Defendants Green, Eckles, Agidius, and Ewan, by and through their attorneys of record, Katharine B. Brereton and Peter C. Erbland of Lake City Law Group PLLC, hereby provide the

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 1**

following Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

## I. FACTUAL AND PROCEDURAL HISTORY

On April 1, 2022, the University of Idaho College of Law held a moment of community event ("Unity Event") to support and acknowledge students and members of the College of Law community who identify at LGBTQA. Ewan Decl. at 2. Students, faculty, and staff gathered in front of the Moscow campus College of Law main foyer at approximately 8:15 a.m. for the Unity Event. Members of the Christian Legal Society ("CLS"), including Plaintiffs Perlot and Miller, were present. Ewan Decl. at 2. Professor Richard Seamon conducted a prayer, and after he concluded the prayer, Jane Doe, referred to in the complaint as "Ms. Doe", directed a question to members of CLS regarding CLS's position on same-sex relationships and marriage. Ewan Decl. at 2-3. Ms. Doe is a queer female. Ewan Decl. at 2.

In response to Ms. Doe, Plaintiff Miller stepped forward and spoke directly to Ms. Doe. Ewan Decl. at 3. Plaintiffs Miller and Perlot made statements that homosexuality was a sin and sinners would "swing from the gallows of hell." Ewan Decl. at 3. Ms. Doe reported that Plaintiffs targeted her at the event and in the days that followed. Ewan Decl. at 3. Ms. Doe reported the following conduct as targeting behavior: she was told that she would go to hell for no other reason beyond her sexuality, that her relationship with her partner was an example of living in sin, that CLS believed that Ms. Doe could seek forgiveness and change her sexuality; her private carrel space was violated with messaging she interpreted as one of the Plaintiffs' efforts to proselytize about extreme hateful religious dogma that Ms. Doe emphatically rejects; and selective biblical scripture were weaponized against her sexuality and touted as the only truth to bring her to a place of acceptance and inclusivity. Ewan Decl. at 3.

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 2**

On the Monday after the Unity Event, Plaintiffs Perlot and Alexander attended an ABA panel. Ms. Doe was present for this panel also. Ewan Decl. at 3. During the discussion at the panel event, Plaintiff Alexander shared his concerns with the ABA panel. Plaintiff Alexander and Ms. Doe were in all the same classes for the spring semester. Ms. Doe reported to OCRI that the Unity Event, in conjunction with behavior at the ABA forum, made her feel targeted and unsafe. Ewan Decl. at 3-4. Ms. Doe also reported to OCRI that Perlot, who did not share carrel space with Doe, located her study carrel and left her a note. Ms. Doe was so frightened by Perlot seeking her out specifically, that she left class immediately and has not returned to class in person. Ewan Decl. at 3-4.

Following the Unity Event, the University's Office of Civil Rights and Investigations ("OCRI") was made aware of student and faculty concerns stemming from the Event. Students reached out not only to OCRI but to University and College of Law administration to share their concerns. OCRI reviewed the various communications shared with them; met with Ms. Doe; documented her concerns; reviewed the relevant material in their possession to date; and gained a better understanding of voluminous LGBTQA community fears about their safety at the College of Law. Ms. Doe was adamant that she felt harassed due to her sexual identity and did not want further contact from Miller, Perlot, or Alexander. Nor did Ms. Doe want to contact them; she requested the issuance of a mutual no-contact order prohibiting her and the individuals from communicating.

Consistent with federal law and University policies and procedures, on April 7, 2022, OCRI issued non-punitive mutual no-contact orders prohibiting Ms. Doe from contacting Plaintiffs and prohibiting each of the Plaintiffs from further contacting Ms. Doe. OCRI did not initiate a formal investigation, nor did Ms. Doe elevate her concerns to a formal Title IX Complaint. Rather,

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 3**

OCRI assessed the collective material available to it and issued mutual no-contact orders as a supportive measure pursuant to Title IX.

On April 25, 2022, Plaintiffs filed their complaint claiming that they have been harmed by mutual no contact orders issued to each of them on April 7, 2022, subsequent to their interactions with Ms. Doe on campus. The mutual no contact orders which Plaintiffs claim violate their First Amendment rights prohibit each of the Plaintiffs from contacting Ms. Doe in any way, including refraining from approaching, attempting to speak to, or making any attempt to communicate with Ms. Doe in any form. As set forth in the mutual no contact orders, "contact" includes, but is not limited to, written contact by mail, letter, or text message, verbal contact by telephone, voicemail, or in person, electronic contact by email, social media, or Skype, and non-verbal contact by other means including pictures, videos, and music. The mutual no contact orders instruct each Plaintiff to sit on the opposite side of the room in any shared classes with Ms. Doe and to contact the University of Idaho's Office of Civil Rights for prior approval before contacting Ms. Doe in relation to relevant academic work.

Based on the issuance of the mutual no contact orders, Plaintiffs have alleged violations of the First Amendment rights to free speech and the free exercise of religion, the Fourteenth Amendment right to due process, and Idaho Code § 73-402, the Free Exercise of Religion Protected Act. Plaintiffs seek declaratory relief, a preliminary and permanent injunction, compensatory damages, nominal damages, and costs and attorneys' fees.

On April 26, 2022, Plaintiffs filed their Motion for a Temporary Restraining Order and Preliminary Injunction asking this Court to rescind the mutual no-contact orders, to terminate any investigation related to the mutual no contact orders, to remove any reference to the mutual no contact orders and any related investigations from each of the Plaintiffs' University records, and

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 4**

to enjoin enforcement of University Policies FSH 2400 and 6100 when speech does not rise to the level of harassment as defined by FSH 6100.

## II. STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted). The Ninth Circuit has affirmed a "sliding scale" approach post-*Winter*. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Pursuant to this approach, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. at 1135 (citations omitted). The standard for issuing a temporary restraining order is the same as the standard for a preliminary injunction. *Chew v. Legislature of Idaho*, 512 F. Supp. 3d 1124, 1127 (D. Idaho 2021).

## III. ARGUMENT

A. **Mutual No-Contact Orders As Supportive Measures Pursuant To Title IX.**

Title IX prohibits discrimination on the basis of sex in education programs that receive Federal financial assistance. 20 U.S.C. § 1681. Title IX regulations impose legally binding rules on recipients of federal funding when responding to sexual harassment. *See* 34 C.F.R. § 106.1 *et seq*. Under the implementing regulations, sexual harassment includes "[u]nwelcome conduct [on the basis of sex] determined by a reasonable person to be so severe, pervasive, and objectively

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 5**

offensive that it effectively denies a person equal access to the recipient's education program or activity". 34 C.F.R. § 106.30.

While "sex" is undefined in the Title IX statute, the Department of Education interprets the prohibition on sex discrimination to cover discrimination based on sexual orientation and gender identity based on the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), concluding that discrimination based on sexual orientation and gender identity intrinsically involves treating individuals differently because of their sex. 86 FR 32637; *see* Executive Order 14021 of March 8, 2021, *Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity*. 86 FR 13803; *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021) (applying *Bostock's* holding that discrimination against a person for being transgender is discrimination "on the basis of sex" to Title IX case).

As a recipient of federal funding, the University of Idaho "must promptly respond" to sexual harassment of which it has actual knowledge. 34 C.F.R. § 106.44. Such a response "must treat complainants[1] and respondents[2] equitably by offering *supportive measures* as defined in [34 C.F.R. § 106.30] to a complainant, and by following a grievance process that complies with [34 C.F.R. § 106.45] before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." *Id* (emphasis added). The University of Idaho's Title IX Coordinator is required to "promptly contact the complainant to

---

[1] A "complainant" is "an individual who is alleged to be the victim of conduct that could constitute sexual harassment." 34 C.F.R. § 106.30.
[2] A "respondent" is "an individual who has been reported to be the perpetrator of conduct that could constitute sexual harassment." 34 C.F.R. § 106.30.

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 6**

discuss the availability of supportive measures as defined in § 106.30, consider the complainant's wishes with respect to supportive measures, inform the complainant of the availability of supportive measures with or without the filing of a formal complaint, and explain to the complainant the process for filing a formal complaint." *Id*.

There are numerous "supportive measures" that may be offered to a complainant or a respondent. 34 C.F.R. § 106.30. By rule, "supportive measures" are "*non-disciplinary, non-punitive individualized services* offered as appropriate, as reasonably available, and without fee or charge". *Id* (emphasis added). Such measures may be offered before or after a formal complaint or even if no formal complaint is ever filed. *Id*. Supportive measures include "mutual restrictions on contact between parties". *Id*. A mutual no contact order is thus "designed to restore or preserve equal access" to educational programs or activities "without unreasonably burdening the other party," protect the safety of all parties or the educational environment, or deter sexual harassment. 34 C.F.R. § 106.30.

When amending Title IX's regulatory provisions in 2020, the Department of Education observed that recipients of federal funding could offer mutual no contact orders to limit the interactions, communications, or contact between parties, and the recipient was not required to initiate "administrative proceedings", meaning a grievance process outlined in 34 C.F.R. § 106.45, in order to implement a no contact order. 85 FR 30184. The Department further observed that a mutual no contact order that restricted either party from communicating with the other was unlikely to unreasonably burden either party. *Id*.

**B.     The Mutual No-Contact Orders And The Title IX Policy Do Not Violate The First Amendment.**

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 7**

Pursuant to the First Amendment, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.  The First Amendment protects the speech of college students on campus with no less force than when in the community at large.  *Healy v. James*, 408 U.S. 169, 180 (1972); *see Tinker v. Des Moines Independent School District*, 393 U.S. 503, 506 (1969).  No one though, even a student, enjoys an unfettered right of free speech.  The First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981). Likewise, student expression which invades the rights of other students is "not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513.

The mutual no contact orders in this case must be viewed in light of these limitations and the government's ability to restrict speech if "substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen v. California*, 403 U.S. 15, 21 (1971).  The Supreme Court has recognized that unwilling listeners of speech are not without recourse and can be afforded protection by the government.  *See Hill v. Colorado*, 530 U.S. 703 (2000); *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997).  "[T]he protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it." *Hill*, 530 U.S. at 716.  "The unwilling listener's interest in avoiding unwanted communication" is based on the "broader 'right to be let alone'" which has been characterized as "'the most comprehensive of rights and the right most valued by civilized men.'"  *Id* (quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissent)).

It is well-settled that "no one has a right to press even 'good' ideas on an unwilling recipient." *Rowan v. Post Office Dept.*, 397 U.S. 728, 738 (1970).  In balancing the speaker's and the unwilling listener's interests, the Supreme Court does not minimize the "importance of 'the

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 8**

right to be free' from persistent 'importunity, following and dogging' after an offer to communicate has been declined." *Hill*, 530 U.S. at 718. The speaker's right to communicate is undoubtedly substantial, but "the right of every person to be let alone must be placed in the scales with the right of others to communicate." *Id* (citations and quotations omitted).

      1.      **The Mutual No Contact Orders Do Not Violate the Free Speech Clause of the First Amendment.**

A content-based restriction that targets speech based on its communicative content is presumptively unconstitutional and is only justifiable if the government proves that the restriction is narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163, (2015). The government must use the least restrictive means to serve the government's purpose. *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020). A restriction is "not narrowly tailored if it is either underinclusive or overinclusive in scope." *Id*. "A regulation of speech is facially content based under the First Amendment if it targets speech based on its communicative content – that is, if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, ___ S. Ct. ___, 2022 U.S. LEXIS 2098, at *12 (Apr. 21, 2022) (citations omitted). For purposes of this Response only, Defendants will proceed to analyze Plaintiffs' First Amendment claim on an assumption that the Court will find that the mutual no contact orders are content-based speech restrictions.

Even applying the strict scrutiny standard, the mutual no contact orders pass constitutional muster. Noticeably absent from Plaintiffs' briefing is the acknowledgment that each Plaintiff is prohibited from contacting one person and only person – Ms. Doe. The no contact orders do not quell any Plaintiffs' speech when not directed at Ms. Doe. Plaintiffs remain free to debate the

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 9**

bases for their religious views with others in the law school community, to proselytize their religious views, and to express their religious beliefs using whatever rhetoric, offensive or otherwise, they so choose. The only limitation on Plaintiffs' speech is that they cannot communicate their beliefs with one unwilling listener who wishes to avoid unwanted communication from Plaintiffs. Additionally, while Plaintiffs believe their speech was communicated respectfully, Ms. Doe very clearly felt otherwise.

That the mutual no contact orders restrict Plaintiffs from communicating their ideas with a single person demonstrates that the means employed by the University for protecting Ms. Doe are narrowly tailored. Plaintiffs are not restricted from contacting any other student nor are they restricted from speaking on the same subject matter and sharing the same views that they spoke on at the Unity Event and in the subsequent events. Furthermore, the no contact orders are neither punitive nor disciplinary in nature. An investigation has not been instituted and a formal complaint has not even been filed against any of the Plaintiffs. Each of Plaintiffs' standing at the University remains unchanged. With respect to Plaintiff Perlot, the mutual no contact order is now unenforceable against him since the University is without authority to enforce the no contact order after a student graduates. Concerns about disclosing the issuance of the no contact order to the state bar are unconvincing. That Plaintiffs may have faced backlash from fellow students for their actions is a consequence anyone may face when sharing their personal beliefs.

The mutual no contact orders undeniably serve a compelling governmental interest. The no contact orders were issued by OCRI pursuant to applicable Title IX authority which required OCRI to offer Ms. Doe supportive measures to ensure that her equal access to the educational environment was preserved. Additionally, the no contact orders balance the Plaintiffs' right to

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 10**

speak with Ms. Doe's wish to be left alone. The no contact orders inherently recognize the right of the unwilling recipient to be free from persistent importunity, following and dogging.

In a case from the Eleventh Circuit where the plaintiff claimed the college's policies violated his First Amendment rights when he was issued a no contact order preventing him from communicating with another female student and subsequently disciplined for text messages sent to the student. *Doe v. Valencia Coll.*, 903 F.3d 1220 (11th Cir. 2018). The Eleventh Circuit found that the plaintiff's conduct invaded the rights of the female student, interfering with her rights to be secure and left alone, and to be free from persistent unwanted advances and related insults. *Id*. at 1230. Citing *Hill v. Colorado* and *Tinker*, the Court concluded that the college was free to regulate the plaintiff's expressive conduct without impinging on his First Amendment Rights. *Id*. at 1230-31.

The mutual no contact orders preventing Plaintiffs from contacting Ms. Doe do not infringe on their First Amendment rights. The mutual no contact orders prevent Plaintiffs from further interfering with Ms. Doe's right to be secure and to be let alone. *Tinker*, 393 U.S. at 508. Ms. Doe does not have to endure being told that her relationship is a sin, being told she will go to hell because of her sexuality, being targeted for her sexuality, or being proselytized to with a religious message she does not support. The mutual no contact orders are a constitutionally permissible means of balancing the rights of Plaintiffs with the privacy interests of Ms. Doe.

> 2. **The Mutual No-Contact Orders and the Title IX Policy Are Not An Unconstitutional Prior Restraint on Speech.**

As with content-based restrictions on speech, courts subject prior restraints on speech to strict scrutiny. *Levine v. United States Dist. Court for Cent. Dist.*, 764 F.2d 590, 595 (9th Cir. 1985). A prior restraint exists when speech is conditioned upon prior approval of public officials.

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 11**

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).  Defendants will address Plaintiffs' arguments directed at the mutual no contact orders and the Title IX policy, FSH 6100. OCRI issued mutual no contact orders as supportive measures pursuant to applicable Title IX authority.  The Student Code of Conduct, FSH 2300, and the University Disciplinary Process for Alleged Violations of Student Code of Conduct, FSH 2400, did not serve as a basis for issuing the no contact orders.[3]

As set forth above, the mutual no contact orders prohibit Plaintiffs from speaking with only one person, and request Plaintiffs to contact OCRI if they believe they need to speak with Ms. Doe about relevant academic work.  Plaintiffs would have this Court believe that their speech has been curtailed so that they may not speak in the arena of public discussion, that their speech has been completely banned, and that they have been effectively silenced from professing their religious beliefs.  This is not so and the limitations in the no contact order speak for themselves.  Plaintiffs remain free to speak to any other person, at any time, in any place, and about any topic. Furthermore, the mutual no contact orders are effective only while Plaintiffs are enrolled students. For Plaintiff Perlot, the University can no longer enforce the no contact order against him. Limiting Plaintiffs' ability to speak to a single person is the least restrictive means for carrying out the University's interest of preserving Ms. Doe's equal access to her education and ensuring that her right to be left alone is respected.

With respect to FSH 6100, the University's Title IX policy, Plaintiffs disregard that the University is required by federal law to operate in compliance with Title IX regulations and, specifically, is required to notify members of the University of Title IX requirements.  FSH 6100

---

[3] "Federal courts owe significant deference to a school's interpretation of its own rules and policies."  *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1148 (9th Cir. 2016).

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 12**

was adopted by the University after the Title IX regulations were amended in 2020. Dkt. 1-5 at 23. In accordance with those regulations, FSH 6100 employs the same language in 34 C.F.R. § 106.30 to define "complainant," "formal complaint," "respondent," "sexual harassment," and "supportive measures". Dkt. 1-5 at 2-5. In responding to a report of sexual harassment, FSH 6100 follows the requirements of 34 C.F.R. § 106.44 by requiring the Title IX Coordinator to offer supportive measures, to inform the complainant of available supportive measures, to consider the complainant's wishes with respect to the supportive measures, and to inform the complainant of the availability of measures even without filing a formal complaint. Dkt. 1-5 at 5-6. FSH 6100, as it pertains to the issuance of mutual no contact orders, is based on the very language employed by the Department of Education in 34 C.F.R. §§ 106.30, 106.44, and 106.45. Contrary to Plaintiffs' arguments, the mutual no contact orders and the Title IX policy upon which the no contact orders were issued are not constitutionally impermissible.

3. **The Mutual No-Contact Orders and the Title IX Policy Do Not Violate the Free Exercise Clause of the First Amendment.**

The First Amendment guarantees the right to freely exercise one's religion, and ensures "the right to believe and profess whatever religious doctrine one desires." *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990), *superseded by statute in other contexts as stated in Holt v. Hobbs*, 574 U.S. 352, 357 (2015). While the First Amendment "excludes all governmental regulation of religious *beliefs*," 494 U.S. at 877 (emphasis in original) (internal citations omitted), the "'freedom to act' pursuant to one's religious beliefs 'cannot be' absolute." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1128 (9th Cir. 2009) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940)). The right to freely exercise one's religion "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 13**

applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Smith*, 494 U.S. at 879. It is well established that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

Contrary to Plaintiffs' contention, the mutual no contact orders do not demonstrate a hostility to their religious beliefs. The no contact orders prevent Plaintiffs from speaking about any topic to Ms. Doe, and not solely about their religious beliefs. That Plaintiffs may not be able to speak about their religious beliefs to Ms. Doe is an incidental burden on their rights. Plaintiffs are otherwise free to continue speaking about their religious beliefs to anyone else.

**C.      Plaintiffs Have Failed To Demonstrate That A Temporary Restraining Order Or Preliminary Injunction Should Be Issued By This Court.**

Demonstrating a likelihood of success on the merits, or "serious questions going to the merits," is the most important element of a preliminary injunction. *Disney Enterprises., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). If the moving party cannot establish this element, the court need not consider the other three factors. *Id*. As set forth above, the mutual no contact orders and the policies of the University do not infringe upon any Plaintiffs' First Amendment rights. The mutual no contact orders prevent Plaintiffs from communicating one other student and do not prohibit Plaintiffs' from speaking to any other person about any topic, religious or otherwise. Even if Plaintiffs have demonstrated a colorable claim for violation of their First Amendment rights, Defendants would likely be entitled to qualified immunity given that in the context of this case, Plaintiffs have not demonstrated that the right allegedly violated was clearly established. *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1160 (9th Cir. 2014).

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 14**

The balance of equities and public interest also weigh against the relief Plaintiffs seek. When balancing the equities, the court balances the interests of all parties and weighs the damage to each. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (cleaned up). However, when the government is a party, the balance of the equities and the public interest merge. *Id*.

The harm the requested injunction would cause the University is substantial. The University would be enjoined from complying with federal law and would be unable to ensure Ms. Doe enjoys equal access to her education. Furthermore, an injunction would likely prevent the University from offering mutual no contact orders as supportive measures in other cases in which sexual harassment is alleged to have occurred if a respondent simply claims their conduct was based on their religious beliefs. Students at public colleges and universities have an interest not only in the protections afforded by the First Amendment, but also in the protections afforded by Title IX. The equities and the public interest weigh against the relief sought by Plaintiffs.

## IV. CONCLUSION

For the reasons set forth herein, Defendants respectfully request the Court to deny Plaintiffs' Motion.

DATED this 16th day of May, 2022.

LAKE CITY LAW GROUP PLLC

/s/ *Katharine B. Brereton*
KATHARINE B. BRERETON
*Attorney for Defendants*

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 15**

CERTIFICATE OF SERVICE

  I HEREBY CERTIFY that on the 16th day of May, 2022, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Matthew C. Williams
WILLIAMS LAW, PLLC          ☒ : Email matt@willimslawoffice.net
812 First St. S.
Nampa, ID  83651
*Attorney for Plaintiffs*


Tyson C. Langhofer
Michael R. Ross            ☒ : Email tlanghofer@ADFlegal.org
Matthew W. Hoffman         ☒ : Email mross@ADFlegal.org
ALLIANCE DEFENDING FREEDOM   ☒ : Email mhoffman@ADFlegal.org
44180 Riverside Pkwy.
Lansdowne, VA  20176
*Attorneys for Plaintiffs*
*Admitted Pro Hac Vice*


                /s/ *Nicky Hastings*
                Nicky Hastings

**RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 16**