UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PETER PERLOT, MARK MILLER, RYAN ALEXANDER, and RICHARD SEAMON, | Case No. 3:22-cv-00183-DCN |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| C. SCOTT GREEN, President of the University of Idaho; BLAINE ECKLES, Dean of Students; ERIN AGIDIUS, Director of the Office of Civil Rights & Investigations; and LINDSAY EWAN, Deputy Director of the Office of Civil Rights & Investigations, all individually and all in their official capacities, | |
| Defendants. | |

## I. INTRODUCTION

Pending before the Court is Plaintiffs Peter Perlot, Mark Miller, and Ryan Alexander's[1] Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing ("PI Motion"). Dkt. 7.  The Court held oral argument on May 25, 2022,

---

[1] As will be explained in the procedural background section below, Plaintiff Richard Seamon was not a part of this case when the PI Motion was filed. Plaintiffs' Counsel has indicated Seamon will not formally be joining the PI Motion.

and took the matter under advisement. Upon review, and for the reasons set forth below, the Court GRANTS the Motion.

## II. OVERVIEW

This case present questions of immense import to all Americans. It involves the clash of two groups' constitutional rights. The Freedom of Speech and the Freedom of Religion are enshrined in the Constitution. So too, is the right to Equal Protection and to be free from unlawful discrimination and harassment. Much can be said about the intersection, and overlapping nature, of these rights and the degree to which one right impacts another. An oft-quoted statement—attributed to various Supreme Court Justices and legal scholars—explains that the "right to swing your arms ends just where the other man's nose begins." Chafee, *Freedom of Speech in War Time*, 32 Harv. L. Rev. 932, 957 (1919). The Constitution is a shield to protect one's fundamental inalienable rights. It is not a sword to hew down the fundamental inalienable rights of others. For instance, one cannot hide behind their constitutional right to free speech in order to shout "fire" in a crowded church to stop others from exercising their constitutional right to freedom of religion.

Courts at every level have been tackling the difficult interplay between various constitutional rights for decades. And the rate at which Courts are being asked to intervene is ever increasing. The Court is cognizant of the fact that in enforcing or protecting certain rights, other rights may be impinged. That said, this case does not appear to present an overly "close call." While universities have a duty to protect students who raise concerns about harassment, they also owe a duty to those accused of the conduct—particularly

MEMORANDUM DECISION AND ORDER – 2

where, as here, the alleged conduct giving rise to the purported harassment is protected speech. It should be noted, that despite the above introduction, this case does not directly involve Jane Doe (the individual who raised concerns) or her constitutional rights. She is not a party to this lawsuit. She makes no claims in this case. Instead, this case involves the Plaintiffs, their constitutional rights, and their claims that the University of Idaho has treated them unfairly in its quest to protect the rights of Jane Doe. Of course, the Court is not so naive as to suggest that Jane Doe's rights have no part to play in this case. They most certainly do. But to point out the obvious once again, she is not a party to this case.

## III. BACKGROUND

### A. Procedural Background

Plaintiffs Perlot, Miller, and Alexander filed their original Complaint on April 25, 2022. Dkt. 1. In their Complaint, Plaintiffs allege Defendants[2] issued no-contact orders against them in violation of their constitutional rights. Plaintiffs' PI Motion followed the next day. Dkt. 7.[3]

Due to the expedited nature of the relief sought, the Court's law clerk held an informal conference with counsel on May 4, 2022, to discuss the best way to proceed with these matters. The Court and Counsel agreed to an expedited briefing schedule on the PI

---

[2] Plaintiffs have sued the University of Idaho's President and Dean of Students, as well as the Director and Deputy Director of the University's Office of Civil Rights and Investigation ("OCRI"). For ease, the Court will refer to Defendants collectively as "Defendants" or "the University."

[3] On May 2, 2022, Plaintiffs filed a Motion to Correct Caption. Dkt. 10. As the result of a clerical error, Defendant Blaine Eckles was misnamed as Brian Eckles in the original Complaint. Plaintiffs requested the case caption—and any other relevant documents—be changed to reflect the correct spelling. The motion is unopposed and is, therefore, GRANTED.

Motion, set the motion for hearing, and shortened the District of Idaho's consent process. Dkts. 13, 14.

On May 10, 2022, Defendants issued a limited contact order[4] against another individual—Plaintiff Professor Richard Seamon. In light of this development, Plaintiffs filed an Amended Complaint on May 17, 2022, adding Seamon as a plaintiff. Dkt. 17. In conjunction with this filing, the parties filed a "Motion to Treat Amended Verified Complaint as Operative Pleading." Dkt. 18. In this submission, the parties jointly move the Court to consider the Amended Complaint as the operative pleading for the PI Motion. The parties explain that the Amended Complaint was necessary in light of Defendants' issuance of the no-contact order against Seamon, but reiterate that the PI Motion "relied on the facts in the original verified complaint, [] and the operative facts and legal claims for purposes of the pending motion remain the same between the pleadings." Dkt. 18, at 2.

It is well-settled that, "[An] amended complaint supersedes the original, the latter being treated thereafter as non-existent." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997), *overruled in part on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012) (en banc). Nevertheless, there is no need for Plaintiffs to refile the PI Motion as the issues raised therein remain the same between both complaints. The parties are in agreement on this, and caselaw supports their position. *See, e.g., Richardson v. Trump*, 496 F. Supp. 3d 165, 176 n.14 (D.D.C. 2020) ("Although Plaintiffs filed their amended complaint after filing their motion for preliminary injunction and before

---

[4] Although Seamon's order is a "limited" contact order, the Court collectively refers to all the orders issued by Defendants in this case as "no-contact orders."

Defendants filed their opposition, the Court finds it appropriate to refer to the factual allegations in the amended complaint."); *16 Front St. LLC v. Miss. Silicon, LLC*, 2015 WL 4665223, at *5 n.8 (N.D. Miss. July 30, 2015) ("Plaintiffs' filing of an amended complaint did not moot Plaintiffs' earlier motion for a preliminary injunction. It is widely recognized that, in general, a party should not be required to file a new motion simply because an amended pleading was introduced while their motion was pending. Instead, as long as the issues raised in the motion apply equally to the original and amended complaints, the court may simply consider the motion as being addressed to the amended pleading. To hold otherwise would be to exalt form over substance." (cleaned up)).

In short, the Joint Motion is GRANTED, and the Court will treat Plaintiffs' Amended Complaint as the operative Complaint for purposes of determining the PI Motion. The facts in the following section come from the Amended Complaint.

### B. Factual Background[5]

On April 1, 2022, the law school at the University of Idaho held a "moment of community" in response to an anti-LGBTQ+ slur that had been left anonymously on a whiteboard in one of its classrooms in Boise, Idaho. Students, faculty, and staff from the law school gathered in front of the Moscow, Idaho, campus to express support for all students.

---

[5] The Court includes facts about Plaintiff Seamon because, as just explained, the Amended Complaint is now the operative complaint. That said, the Court provides these facts only for reference as Seamon has not joined the PI Motion. Despite taking this approach, the Court notes that its discussion and findings today would likely apply to Seamon as well. Afterall, Seamon's allegations mirror those of Perlot, Miller, and Alexander, and the Court's legal analysis as to those Plaintiffs would extend to Seamon as he is similarly situated.

Plaintiffs were present at the event. Plaintiffs Perlot, Miller, and Alexander are law students and members of the University's chapter of the Christian Legal Society ("CLS").[6] Plaintiff Seamon is a professor at the law school and the CLS faculty advisor.

At the event, Plaintiffs gathered in prayer—with members of their society and others—in a showing of support for the LGBTQ+ community. After the prayer concluded, Jane Doe[7] approached the group and asked those present why the CLS constitution affirms that marriage is between one man and one woman. Plaintiff Miller explained that CLS adhered to the traditional biblical view of marriage and sexuality—including the concept that marriage is defined as being between one man and one woman. Jane Doe expressed her opinion that the Bible did not support such a conclusion. Miller explained further that the Bible defines marriage as between one man and one woman in several places and that it condemns homosexuality—along with all other sins. Plaintiff Seamon purportedly affirmed Miller's explanation of CLS's position on marriage.

According to both sides, the parties then parted ways without further comment.

Shortly after the event, Plaintiff Perlot left a handwritten note on Jane Doe's carrel. The note read—in its entirety: "I'm the president of CLS this semester. Feel free to come talk to me if you have anything you need to say or questions you want to ask. I'm usually

---

[6] Plaintiff Perlot has since graduated from law school, but he was a third-year law student and President of the University's CLS chapter at the time of these events.

[7] To respect her privacy, the parties refer to this individual as "Jane Doe." Jane Doe is a queer female and a law student at the University of Idaho School of Law.

in my carrel: 6-034. over by the windows. Peter [smiley face]." Dkt. 20-1, at 10.[8]

A few days later, on April 4, 2022, Plaintiffs Perlot and Alexander attended an event with other students regarding the American Bar Association's accreditation of the law school. According to Plaintiffs, Jane Doe and others raised concerns about CLS and its members—namely that they held religious beliefs that were bigoted and anti-LGBTQ+.[9] Plaintiff Alexander then spoke up, defended CLS, and stated that the biggest instance of discrimination he had seen on campus was actually against CLS and the administration's failure to timely recognize and register it as a group.

That same day, several students staged "walkouts" for two of the courses taught by Plaintiff Seamon—seemingly in response to his participation at the event on April 1.

Also on April 4, Defendant Lindsay Ewan—Deputy Director of OCRI—interviewed Miller about the events that took place during the law school's community event on April 1.

Three days later, on April 7, 2022, Plaintiffs Perlot, Miller, and Alexander received no-contact orders from OCRI. Apparently, Jane Doe reported to OCRI that Plaintiffs' actions at the events described above left her feeling "targeted and unsafe." Dkt. 16, at 3. The no-contact orders prohibit Plaintiffs from having any contact with Jane Doe unless

---

[8] Defendants relay that Jane Doe interpreted this action as "violating" her private carrel with "messaging she interpreted as one of the Plaintiffs' efforts to proselytize about extreme hateful religious dogma that [she] emphatically rejects." Dkt. 16, at 2.

[9] Defendants conspicuously avoid discussing who initiated the comments at the ABA meeting by claiming simply that Jane Doe was "present for this panel" and that "Plaintiff Alexander shared his concerns with the [] panel." Dkt. 16, at 3. It appears, however, that Jane Doe (along with others) brought up CLS first; then Plaintiffs responded.

they receive advance permission from OCRI. The orders apply on and off campus, do not have termination dates, and state that "[a]ny action deemed to be in violation of this no-contact order will be taken seriously and considered retaliation. Further action may be taken by this administration as a result, which could include suspension or expulsion." Dkts. 17-17–17-19.

Plaintiffs apparently tried to resolve these issues with the University themselves and then with the aid of legal counsel, but to no avail. This lawsuit followed.

After the filing of this suit—in fact after Plaintiffs had filed the instant PI Motion—OCRI issued a limited contact order against Plaintiff Seamon.

Plaintiff Seamon is a law professor. Sensing the community event may have caused Jane Doe stress, Seamon emailed her on April 3, 2022, to express his concern for her well-being. Jane Doe thanked Seamon for "reaching out," said she was still processing matters, and stated she would speak to him later in the week during his office hours. Dkt. 17-22. Jane Doe never met with Seamon, however, and began attending his class online due to some personal health issues. Seamon reached out again on April 26, 2022, to inquire whether Jane Doe wanted to speak. On April 27, 2022, Jane Doe sent an email to Seamon, copying the law school's dean and associate dean, in which she stated, in part:

> Your event caused me to fear for my life at the university of Idaho. I am scared to be on campus, I am scared to be in your class. I fear you. I fear the CLS. My life, my grades, my law school career are not safe with a professor that is actively working towards taking away my human rights.
> …
> The group you are the admin for, subjected me and others to violent verbal abuse, in which you took the lead on and agreed with. This has created unpreparable [sic] damage to your students and faculty at the school of law. If you continue to email me, I will file get [sic] a restraining order from the

police.

Dkt. 17-23, at 3. Jane Doe then demanded that Seamon respond to the Deans (and not her) affirming that she would not be docked participation points for attending class remotely. Jane Doe gave Seamon a deadline by which to respond. *Id.*

On May 10, 2022, OCRI issued a limited contact order against Seamon. Like the no-contact orders issued to the student Plaintiffs, this order prohibits Seamon from contacting Jane Doe for anything except "what is required for classroom assignment, discussion, and attendance." Dkt. 17-24.

As noted, Seamon joined as a Plaintiff in this case on May 17, 2022, but has not officially joined in the PI Motion.[10]

In their PI Motion, the Plaintiffs request that the Court order Defendants to:

1.    Rescind the no-contact orders issued to Plaintiffs;

2.    Terminate any investigation related to the no-contact orders issued to Plaintiffs based on allegations of protected speech alone;

3.    Remove any reference to the no-contact orders and investigations related to the no-contact orders in the University's records for Plaintiffs; and

4.    Stop enforcing Policy 2400 and Policy 6100 to restrict or punish speech based on allegations of pure speech alone that does not rise to the level of harassment as defined in Policy 6100 Section D-19(b).

Dkt. 7, at 9. Defendants oppose the PI Motion.

---

[10] Thus, unless otherwise noted, the use of the phrase "Plaintiffs" in the remainder of this decision means the student Plaintiffs and not Seamon.

After Plaintiffs filed their reply to their PI Motion—and on the eve of the hearing—Defendants filed a Motion for Leave to File. Dkt. 20. Therein, Defendants sought leave to file the supplemental declaration of Defendant Lindsay Ewan to "address factual contentions and arguments raised by Plaintiffs in the Reply brief." *Id*. at 2. Along with Ewan's declaration, Defendants provided a copy of a previously unmentioned email,[11] and a copy of the above-mentioned note that Perlot left on Jane Doe's carrel. Dkt. 20-1, at 6–10. Plaintiffs have not taken a position on the Motion for Leave to File. Good cause appearing, the Court will grant the Motion for Leave to File and give the supplemental declaration and attached exhibits the weight it deems appropriate.

## IV. LEGAL STANDARD

Plaintiffs seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (cleaned up).

Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply towards the plaintiff can support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 622 F.3d 1045, 1053 (9th Cir. 2010).

---

[11] This email was sent from Miller to other members of CLS. It *was not* sent to Jane Doe. Someone forwarded this email to Defendants. In a quasi-"totality of the circumstances" argument, Defendants claim they considered this email as part of deciding whether to issue the no-contact orders. To begin, this email was not sent to Jane Doe—the individual Plaintiffs are prohibited from contacting. Furthermore, while passionate, there is nothing in this email that would be cause for concern. As such, the email does not play a large role in the Court's decision today.

Serious questions are those "which cannot be resolved one way or the other at the hearing on the injunction." *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 926 (9th Cir. 2003) (cleaned up).

A preliminary injunction may only be awarded "upon a clear showing" of evidence that supports each relevant preliminary injunction factor. *Winter*, 555 U.S. at 22. "This 'clear showing' requires factual support beyond the allegations of the complaint, but the evidence need not strictly comply with the Federal Rules of Evidence." *CI Games S.A. v. Destination Films*, 2016 WL 9185391, at *11 (C.D. Cal. Oct. 25, 2016) (*citing Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

While "a plaintiff may not support a motion for a preliminary injunction by merely pointing to his complaint and the facts alleged therein," *Shaterian v. Wells Fargo Bank. Nat. Ass'n*, 2011 WL 2314151, at *4 (N.D. Cal. June 10, 2011), a "verified complaint . . . may afford the basis for a preliminary injunction." *K-2 Ski Co. v. Head Ski Co*., 467 F.2d 1087, 1088 (9th Cir. 1972); *accord Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) ("A verified complaint may be treated as an affidavit, and, as such, it is evidence that may support injunctive relief"), *overruled on other grounds Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019); *see also* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2949 (3d ed. 2020) (explaining that "pleadings may be considered" as evidence in support of a preliminary injunction "if they have been verified"); *e.g.*, *Myers v. Thompson*, 192 F. Supp. 3d 1129, 1138 (D. Mont. 2016) (stating that the plaintiff's "verified complaint is treated as an affidavit, and thus may be used as evidence to support an injunction").

The basic function of a preliminary injunction is to "preserve the status quo ante litem pending a determination of the action on the merits." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980).

The Court will address each of the necessary elements for a preliminary injunction in turn.

# V. ANALYSIS

To begin, the Court must discuss what relevance, if any, disputed facts play in its decision today. Some factual matters in this case are in dispute.[12] And while there is caselaw explaining that is it best to *hold a hearing*[13] when disputed facts are present, the Court is not aware of any requirement that facts must actually be resolved in order to issue (or deny) an injunction. To the contrary, "in deciding a motion for a preliminary injunction, the district court 'is not bound to decide doubtful and difficult questions of law or disputed questions of fact.'" *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799

---

[12] For example, what exactly was said at the community event is in dispute. Defendants state that Jane Doe reported Miller or Perlot framed their comments as: homosexuality is a sin and sinners will "swing from the gallows of hell." Dkt. 16, at 2. Plaintiffs Perlot and Miller have submitted affidavits vehemently denying that they (or anyone at the event) said Jane Doe, or anyone else, would "swing from the gallows of hell." Dkts. 19-1, 19-2. In reply, Defendant Lindsay Ewan submitted an affidavit confirming that one unnamed student and one unnamed faculty member reported to her that "members of CLS made the comment that sinners would 'swing from the gallows of hell.'" Dkt. 21, at 2. Nothing in the record, other than Ewan's Declaration that Doe said Perlot or Miller said it, suggests that any of the named Plaintiffs made this statement—and they affirmatively deny making such a statement. As such, Defendants appear to have held Plaintiffs responsible for an alleged statement attributed by unnamed individuals to an unnamed member(s) of CLS.

[13] *See, e.g., Dodge v. Cnty. of Orange*, 208 F.R.D. 79, 86 (S.D.N.Y. 2002) ("A district court must conduct a hearing on a motion for preliminary injunction where the essential facts are in dispute."); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1313 (11th Cir. 1998) (". . . where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing."). The Court agrees with this concept. However, a hearing was held in this instance (and neither side requested an opportunity to present evidence), so these cases are, to some degree, irrelevant.

F.2d 547, 551 (9th Cir. 1986) (citing *Dymo Indus., Inc. v. Tapewriter, Inc.,* 326 F.2d 141, 143 (9th Cir.1964)); *see also SQP, Inc. v. Sirrom Sales, Inc.*, 130 F. Supp. 2d 364, 368 (N.D.N.Y. 2001) (citing *Dymo*) ("A disputed question of fact such as this need not be resolved on an application for a preliminary injunction. Rather, determination of disputed facts should be made at trial.").

Thus, the existence of disputed facts does not preclude the court from ruling on the PI Motion at this time. Furthermore, the disputed facts in this case are not clearly material. As will be explained below, even assuming the facts from Jane Doe's perspective, such does not change the fact that the University overstepped when it issued the no-contact orders against Plaintiffs.

The Court returns to the *Winter* factors.

**A. Success on the Merits**

As is the case with most preliminary injunctions, the parties spend the bulk of their time discussing this factor. And while Plaintiffs bring four causes of action in their Amended Complaint—(1) First Amendment: Freedom of Speech; (2) First Amendment: Free Exercise of Religion; (3) Fourteenth Amendment Right to Due Process of Law; and (4) Idaho Free Exercise of Religion Protected Act—they largely focus on their first cause of action: Freedom of Speech under the First Amendment. Defendants responded in kind. The Court will likewise focus on Plaintiffs' first claim and address the remaining claims in summary fashion.

*1. First Amendment: Freedom of Speech*

Plaintiffs assert that Defendants' no-contact orders discriminate against them based

on the content and viewpoint of their speech, inflict a prior restraint, and burden the exercise of their religion. Similarly, Plaintiffs contend Defendants' Title IX Policy and their Discipline Policy—under which Defendants issued the no-contact orders—impose a prior restraint, grant unbridled discretion to Defendants, and burden Plaintiffs' religion.

Pursuant to the First Amendment, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment protects the speech of college students on campus with no less force than when in the community at large. *Healy v. James*, 408 U.S. 169, 180 (1972); *see also Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969).

Content-based regulations on speech are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). That is because *any* content-based restriction "completely undercut[s]" our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972).

The prohibition on content discrimination "put[s] the decision as to what views shall be voiced" where it should be—"into the hands of each of us." *Cohen v. California*, 403 U.S. 15, 24 (1971). Indeed, "no other approach would comport with the premise of individual dignity and choice upon which our [] system rests." *Id.*

Content-based regulations "appl[y] to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. To assess content discrimination, courts "consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys." *Id.* (cleaned up). When a college

MEMORANDUM DECISION AND ORDER – 14

targets not only the topic discussed but also "particular views taken by speakers on a subject," the college violates free speech rights "all the more blatant[ly]." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

In this case, it appears that Defendants issued the no-contact orders to Plaintiffs because Plaintiffs discussed their sincerely held religious beliefs about marriage and because they discussed religious discrimination. Thus, it appears the no-contact orders apply to Plaintiffs because of the "message expressed." *Reed*, 576 U.S. at 163.

Similarly, Defendants' orders targeted the viewpoint of Plaintiffs' speech. Both students and professors expressed opposing viewpoints to the views expressed by Plaintiffs without any type of intervention, let alone punishment. For example, after Plaintiffs expressed their religious view on marriage, a professor posted a sign in the law school saying, "At this public university your personal religious beliefs are not an excuse to deprive others of their rights under the law." Dkt. 17, ¶ 117.[14] And the president of the law school's student government posted on Facebook that he was "sickened and saddened" by Plaintiffs' religious speech because it went "beyond the pale." *Id.* ¶¶ 118–92. Defendants did not respond by restraining—or even addressing—any of this speech. Thus, while all of these parties' speech was on the same topic, only one viewpoint—Plaintiffs—was deemed worthy of intervention and discipline.

---

[14] Phrases such as this have taken root in recent years and paint an overtly negative picture of religious liberty. The assumption such phrases implicate is that people use their religion to mask discriminatory conduct and then try to "hide" from any legal consequences by invoking religious protection. The Court will not dissect why this assumption is a shallow look at religion, and fails to provide any substance to numerous individual constitutional rights. Suffice it to say, in a pluralistic society, people should honor differing viewpoints and build bridges of understanding instead of arguing that opposing viewpoints are inherently discriminatory and must be punished or excluded from the public square.

The disparity in Defendants' approach is what bothers the Court most about this case and leans towards a finding that Defendants' actions *were* designed to repress specific speech. Jane Doe *approached* CLS members at the community event on April 1. *She* asked them a question. And critically, her question was not "*what* do you believe on this topic," but "*why* do you believe the way you do on this topic?" In other words, Jane Doe knew (at least to some degree) what members of CLS believed on the subject of marriage.[15] That she did not agree with the answer Plaintiffs provided is, therefore, not surprising. What is surprising, however, is that Plaintiffs have suffered certain consequences for expressing their personal viewpoints at this event, while Jane Doe has not—even though she expressed opinions contrary to Plaintiffs' sincerely held religious beliefs. Certainly, there is nothing in the record at this point to suggest that Plaintiffs went to the event to cause disruption or to target certain people.[16]

In like manner, there is no indication that Jane Doe—or any other student—who spoke out against CLS at the ABA event was the subject of any measures to curtail their views and opinions; but Plaintiffs were.

---

[15] The Court is not implying that a person has to submit to any response after instigating a conversation. However, it seemingly contradicts a person's claim of "targeted" harassment when that person initiated the conversation, sought the response, and was willing to engage in the discussion (at least initially).

[16] As noted, accompanying the Supplemental Affidavit of Lindsay Ewan is an email Plaintiff Miller sent to members of CLS on April 2, 2022. Dkt. 21, at 7–8. Although Defendants suggest "Jane Doe was aware of this email sent by Miller," nothing in the email suggests that the events on April 1, 2022, were planned ahead of time or were intended to cause disruption or targeting. In like manner, nothing in the email can be relied upon to show that the events on April 4, 2022, were planned or calculated by Miller because there is nothing in the record to show Miller attended the April 4, 2022 ABA meeting.

This begs the question: do Defendants only take action when someone complains? It appears the answer is yes. And to be sure, the Court is not implying such an approach is inherently wrong. Afterall, most organizations do not continually police their employees, their students, or their patrons just to see if anyone is violating another person's rights. As noted above, to some degree, violations are in the eye of the beholder.[17] One person might feel threatened by certain speech even though another person would not. But the question here today is not who subjectively feels threatened by what speech, but whether Defendants' behavior meets constitutional muster when dealing with someone whose speech allegedly made another person feel threatened—particularly in light of the fact that the regulated speech was based upon the speakers' sincerely-held religious beliefs.

In short, the Court agrees Plaintiffs have a high likelihood of showing Defendants violated the First Amendment by issuing the no-contact orders based on the content and viewpoint of their speech.

This does not end the inquiry, however. While content-based discrimination is presumptively invalid, if the government can rebut that presumption, the restrictions may stand. This burden, however, is high and heavy.

Content and viewpoint discrimination must survive strict scrutiny. *Reed*, 576 U.S. at 163–64. That is, the government bears the burden of proving its discrimination is "the least restrictive means available to further a compelling government interest." *Berger v.*

---

[17] To wit, the Court does not know Jane Doe. It does not know her history or life experiences. The Court does not mean to imply today that Jane Doe's *feelings* are invalid. Based upon her life circumstances, she could subjectively see things any way she desires. The Court is concerned, however, with the manner in which Defendants interpreted and/or evaluated Jane Does' feelings as applied to Plaintiffs, and against the backdrop of the Constitution and their duty to protect *all* interested parties' rights.

*City of Seattle*, 569 F.3d 1029, 1050 (9th Cir. 2009) (en banc). Here, Defendants do not appear to be able to meet this "exacting standard." *Id.*

Defendants proffer two main arguments in support of their decision to issue the no-contact orders. First, they claim they had essentially no choice under Title IX but to issue the no-contact orders. Second, they assert that because the no-contact orders are mutual, they did not violate Plaintiffs' rights. Neither argument is persuasive.

Title IX regulations require the Title IX coordinator to "discuss the availability of supportive measures," "consider the complainant's wishes with respect to supportive measures," and "inform the complainant of the availability of supportive measures with or without the filing of a formal complaint." Dkt. 16 at 6–7 (quoting 34 C.F.R. § 106.44(a)). "Supportive measures *may* include" a no-contact order against a "respondent," that is "an individual who has been reported to be the perpetrator of conduct that could constitute sexual harassment." 34 C.F.R. § 106.30(a) (emphasis added). The regulations do not, however, *require* the Title IX coordinator to issue no-contact orders or other supportive measures. To the contrary, a no-contact order must be "appropriate [and] reasonably available," and cannot "unreasonably burden[]" the respondent. 34 C.F.R. § 106.30(a).

Of note, Title IX—and Defendants' own policy—define harassment to include "conduct on the basis of sex"[18] that is "determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the

---

[18] In light of the Supreme Court's decision in *Bostock v. Clayton County*, discrimination on the basis of sex necessarily includes discrimination on the basis of sexual orientation or gender identity. 140 S. Ct. 1731 (2020).

University's education program or activity." Dkt. 16 at 5–6 (quoting 34 C.F.R. § 106.30).

But there appears to be no sexual harassment in this case. While Jane Doe seems to believe that the viewpoints Plaintiffs expressed constitute sexual harassment because she is a member of the LGBTQ+ community, Defendants appear hesitant to reach the same conclusion. They reassert Jane Doe's beliefs, but nowhere in their briefing do Defendants actually contend any Plaintiff engaged in sexual harassment. And how could they? Nothing here appears to be "so severe, pervasive, and *objectively* offensive" as to hamper Jane Doe's access to her University education.[19] *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999) (to be actionable, harassment must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit"). What's more, "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause." *Rodriguez*, 605 F.3d at 708. "Harassment law generally targets conduct" and it can "sweep[ ] in speech . . . only when consistent with the First Amendment." *Id.* at 710.[20] Anti-harassment measures cannot target "pure speech." *Id.; see also Lopez v. Candaele*, 630 F.3d 775, 791 (9th Cir. 2010) (finding that a university would have to take a "strained construction" of its own sexual harassment policy to make it "applicable to religious speech opposing homosexuality or

---

[19] The Court is loath to question Defendants' approach in the abstract. Particularly in light of well-known facts surrounding sexual harassment and the lack of reporting. Thus, the Court is not implying that a complainant's version of events should never be taken at face value. However, it is the University's duty to take proper steps to ensure its actions still comport with all constitutional protections.

[20] Additionally, "core political and religious speech," is "within a student's First Amendment rights" even if it "offends someone," so long as it "does not pose a realistic threat of substantial disruption." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001).

gay marriage").

Simply put, this is not a Title IX harassment case. Jane Doe is not a party to this lawsuit and has not brought any legal claim here, let alone one alleging a Title IX violation. Jane Doe did not even file a formal complaint with OCRI. And, as noted, the Defendants do not argue Plaintiffs engaged in any sexual harassment. Despite this, Defendants try to use Title IX to justify the no-contact orders. Using Title IX as an excuse when there is no underlying sexual harassment to trigger Title IX is untenable and jeopardizes the vitality of Title IX.

Instead of focusing on sexual harassment, Defendants focus on harassment in general and argue that people have a right to be free from being bothered. Title IX does not provide such a right. Defendants assert that "no one has a right to press even 'good' ideas on an unwilling recipient," *Rowan v. Post Office Dept.*, 397 U.S. 728, 738 (1970)[21], and that the no-contact orders protect Jane Doe from being an "unwilling recipient" of speech she disagrees with so she can "be free from persistent importunity, following and dogging." Dkt. 16, at 11 (citing *Hill v. Colorado*, 530 U.S. 703, 718 (2000)).

Defendants' argument misses the point. The Court in *Hill* made a clear distinction between the right to attempt to persuade others to change their views and offensive speech that is so intrusive that the unwilling audience cannot avoid it. The right to free speech cannot be curtailed simply because the speaker's message may be offensive to his audience.

---

[21] *Rowan* involved the sending of unwanted materials into the sanctuary of another's home, not a public interaction. In fact, the paragraph cited by Defendants ends with this sentence: "The asserted right of a mailer, we repeat, stops at the outer boundary of every person's domain." 397 U.S. at 738.

Indeed, *Hill* stated that, in contrast to an individual's right to free speech, the right to be let alone is "the most comprehensive of rights and the right most valued by civilized men." *Hill v. Colorado*, 530 U.S. 703, 717 (2000). While individuals have the right to persuade, no one has a right to press even "good" ideas on an unwilling recipient. *Id.* However, Plaintiffs' "offensive message" here never crossed into the "offensive speech" addressed in *Hill*.[22]

Defendants offer virtually no support for their somewhat novel proposition that limited public interactions should require a no-contact order to allow a person to be free from persistent importunity, following, and dogging.[23] And, contrary to Defendants' argument, the Supreme Court has repeatedly affirmed that the "college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (cleaned up). Without the freedom "to inquire, to study and to evaluate," the Court has warned that "our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

---

[22] The majority in *Hill* stated, "We, of course, are not addressing whether there is such a "right" [the right to avoid unpopular speech in a public forum]. Rather, we are merely noting that our cases have repeatedly recognized the interests of unwilling listeners in situations where 'the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure.'" *Id.* at 718.

[23] Defendants cite to a case out of the Eleventh Circuit, *Doe v. Valencia Coll.*, 903 F.3d 1220 (11th Cir. 2018)) in support of this proposition. The facts of that case, however, are drastically different from what is present in this case—to the point that it is all but inapplicable. In *Doe*, the college suspended a male student who sent a female student "dozens of messages throughout the night making lewd references to her body." *Id.* at 1230. The female student made "repeated pleas that he stop contacting her," but "he continued to send unwanted messages over a period of days." *Id.* He even sent her twenty messages after the college imposed a time limited no-contact order. *Id.* at 1227. Applying *Tinker*, the court concluded that the college could suspend the male student for invading the female student's right "to be let alone." *Id.* at 1229 (citing *Tinker* 393 U.S. at 509). Again, Plaintiffs' attempts to respond to Doe's inquiries are nothing like the student's behavior in *Doe*.

Even outside the confines of a college campus, the cases Defendants cite in support of their "left alone" argument acknowledge that the First Amendment protects the "right to persuade." *Hill,* 530 U.S. at 717. After all, "[w]e are a social people and the accosting by one of another in an inoffensive way and an offer by one to communicate and discuss information with a view to influencing the other's action are not regarded as aggression or a violation of that other's rights." *Id*. (cleaned up). A person's interest in freedom from "importunity, following and dogging" ripens only "after an offer to communicate has been declined." *Id*. at 718. Jane Doe made no such request in this case. She never declined to speak with Plaintiffs; in fact, she initiated the interactions at the two events.[24] And while the University took some initial "investigatory"[25] steps, those steps were largely one-sided. At no time did Jane Doe—personally or via OCRI—tell Plaintiffs she did not want to speak with them *before* the no-contact orders were issued. The University never provided an opportunity for informal resolution either.

The Court finds Defendants' Title IX arguments unpersuasive.[26] Again, there is a difference between disagreeable speech and harassing speech, and Defendants' rush to

---

[24] To be sure, Jane Doe had no control over Perlot leaving a note on her carrel. But there is no indication she responded in any way to inform Perlot that this contact was unwelcomed—either before or after it occurred.

[25] The Court uses this term in the colloquial sense. Ewan informed Perlot, in response to his inquiries about OCRI's process, that "no investigation has occurred." Dkt. 1-19, at 3. And, at oral argument, Defendants reaffirmed that Jane Doe has not filed a formal complaint, thus, OCRI has not undertaking any type of "formal" investigation.

[26] *Could* behavior similar to the behavior alleged here warrant Title IX intervention? Possibly. For example, if Plaintiffs were to persist in contacting Jane Doe against her wishes or were to escalate their efforts to more invasive or harassing contact, the Court could understand how that would disrupt Jane Doe's educational experience. As it stands, however, it appears to be the general tenor of Plaintiffs' beliefs (expressed or not) that is causing Jane Doe stress rather than anything Plaintiffs actually said or did. It goes

issue no-contact orders—when other avenues were available—shows limited balance and little to no effort at ensuring their actions were the least-restrictive means for accomplishing their goals.

And, even assuming arguendo that something one of the Plaintiffs said was subjectively offensive, a single instance of "offensive" speech rarely rises to Title IX's harassment definition. *See Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 676 (7th Cir. 2008) ("[I]t is highly speculative that allowing the plaintiff to wear a T-shirt that says 'Be Happy, Not Gay' would have even a slight tendency to provoke [harassment], or for that matter to poison the educational atmosphere."); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 322–23 (3d Cir. 2013) (wearing bracelet saying "I ♥ Boobies" does not "breed an environment of pervasive and severe harassment"); *see also Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003) (holding that "gender discrimination must be more widespread than a single instance of one-on-one peer harassment and [] the effects of the harassment [must] touch the whole or entirety of an educational program or activity").

Defendants next claim the no-contact orders at issue here are "mutual" and, therefore, are not specifically directed at Plaintiffs or their speech, but rather at creating a harmonious environment amongst all students. However, calling them "mutual no-contact" orders—38 times in their 14-page brief no less—does not make them so. Nor does it

---

without saying that individuals interact with, work among, and even live with, people with whom they disagree. But such does not warrant intervention. And even in an educational setting (where the government is an actor), a person does not have a right to be shielded from everything with which they disagree.

absolve Defendants of their constitutional duties. It does appear that Jane Doe was issued a similar order *at her request*. Each of the Plaintiffs no-contact orders state as much.[27] But there is a stark difference between a student receiving an order because she said, "I don't want people contacting me and, therefore, I agree not to contact them,"[28] and a student receiving an order saying, "*You* cannot contact other people because of your behavior/speech/viewpoint."

The latter point is perhaps the most difficult part of this case. The Court does not know if OCRI has issued other such no-contact orders, in what circumstances, and under what parameters. The Court also does not know what standard OCRI uses when determining whether to issue such an order in the first place. Discovery will flesh these matters out, but the Court must return to the question at hand: under strict scrutiny, were Defendants actions the least restrictive means available? The answer is likely no. Defendants did not even talk to most of the Plaintiffs about Jane Doe.[29] This enhances the likelihood of success on Plaintiffs' first claim.

Defendants further argue Plaintiffs can still talk to anyone else on campus about whatever they want and, therefore, their actions were "narrowly tailored"—it was just

---

[27] The Court has not, however, actually been provided a copy of any order issued by OCRI to Jane Doe.

[28] This is a foregone conclusion with a no-contact order. Plaintiffs cannot contact Jane Doe without retribution. It would be illogical to assume, however, that it would be permissible for Jane Doe to contact Plaintiffs. Thus, the no-contact orders are "mutual," but only because that is the only rational way for such orders to be effective.

[29] While OCRI spoke with Miller about the events from April 1, there is no evidence they spoke with the other Plaintiffs. What's more, Ewan's conversation with Miller appears to have been as much about protecting Miller and letting him know about Title IX resources as it was about protecting Jane Doe.

Plaintiffs' speech *as applied to Jane Doe*. But Defendants miss the mark. "If the state wishes to regulate speech, then it must undertake the burden to show a precise nexus between that speech and some evil which the state has a right to prevent." *Watters v. Otter*, 986 F. Supp. 2d 1162, 1182 (D. Idaho 2013) (emphasis added). Thus, in "narrowly tailoring," Defendants need to look at Plaintiffs, not at Jane Doe. Defendants must show that restricting all of Plaintiffs' speech to Jane Doe is the least restrictive means to achieving their end. "[E]ach activity within the proscription's scope" must be "an appropriately targeted evil." *Berger v. City of Seattle*, 569 F.3d 1029, 1053 (9th Cir. 2009). Defendants cannot "abridge[ ]" Plaintiffs' "exercise of [their] liberty of expression in appropriate places . . . on the plea that it may be exercised in some other place." *Reno v. ACLU*, 521 U.S. 844, 880 (1997).

Furthermore, it is *not* actually clear Plaintiffs will be able to talk about whatever they want with whomever they want in the future. As discussed, the speech at issue here can hardly be said to be harassment. But when each Plaintiff stated his religious view, such views were deemed harassing and worthy of action by OCRI. What happens when Plaintiffs discuss their religious views with others?[30] It is not difficult to imagine another

---

[30] Additionally, the Court notes that Plaintiff Seamon will be teaching a course this fall on the Fourteenth Amendment and individual rights. He is the only professor for this required course. Jane Doe is enrolled in this course. It remains unknown to what degree Plaintiff Seamon will be allowed to interact with Jane Doe without incurring discipline. What's more, a class on individual rights will surely discuss topics that some might find polarizing. If Seamon discusses individual rights in regard to the legal topics of LBGTQ+ rights, abortion, immigration, religion, or race, does he run the risk that someone will take subjective offense to his comments and allege he is violating *their* individual rights in his individual rights class? The question seems almost satirical.

student (or professor) taking offense to something Plaintiffs say and trying to utilize OCRI's process in this manner again.

Surely, issuing no-contact orders left and right for speech that is viewed more or less favorably by one party is not the least-restrictive means of protecting everyone involved. Defendants have not shown their approach is narrowly tailored or that it will protect Plaintiffs' rights in the future.[31]

Finally, Defendants argue there is no harm because *they* view the no-contact orders as non-punitive. Again, the Court disagrees. Plaintiff Perlot recently applied to sit for the State of Oregon bar exam. Dkt. 19-1, at 2. The application requires applicants to disclose any "no contact order[s]" they have received and warns that "[l]ack of complete candor" could lead to "denial of admission to the bar." *Id*. Because the no-contact orders in this case still apply to graduated students, Perlot had to explain the no-contact order as part of his application. The Oregon Bar investigation is ongoing. Defendants' subjective view of the no-contact orders does not alter the punitive nature of an investigation by a state's professional licensing board.[32]

In conclusion, the Court finds Plaintiffs are likely to succeed on the merits of their

---

[31] Similarly, Defendants fail to demonstrate their approach is not a prior restraint on speech. Defendants claim they only relied on their Title IX Policy and not their Discipline Policy when issuing the no-contact orders. Dkt. 16 at 12 & n.3. Courts, however, only owe deference to Defendants' "reasonable" interpretation of their policies. *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1148 (9th Cir. 2016). It is unreasonable for Defendants to contradict the plain text of their Discipline Policy which allows, but does not mandate, the "[i]ssuance of a no-contact order." Dkt. 17 ¶ 69. Plaintiffs appear poised to succeed on this argument as well.

[32] Furthermore, the no-contact orders are perpetual, without any end date. It is conceivable that one or more Plaintiffs and Jane Doe will practice in the same State as members of the same bar. Under the no-contact order as currently written, Plaintiffs would be unable to represent clients in any case in which Jane Doe is representing a client. They would also be unable to attend any local bar meeting if Jane Doe is also present.

First Claim.

    2.  *Remaining Claims*[33]

Echoing its analysis above, the Court finds Plaintiffs are likely to succeed on their Second Claim—First Amendment: Free Exercise of Religion—and their Third Claim—Fourteenth Amendment Right to Due Process of Law.

Plaintiffs' right to "free exercise" includes not just the right to *believe*, but the right to *exercise* their faith. It encompasses the right to "profess whatever religious doctrine one desires," *Emp. Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877 (1990), and to "communicat[e]" those teachings to others, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 199 (2012) (Alito, J., concurring). Under the Free Exercise Clause, a law or rule that is not neutral or generally applicable is subject to strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

Defendants' policies are not generally applicable because they create "a system of individualized governmental assessment of the reasons for the relevant conduct." *Lukumi*, 508 U.S. at 535, 537. Governments establish "a system of individualized exemptions" when they apply "a subjective test" on a "case-by-case basis" to assess if particular conduct is forbidden. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004).

Defendants' no-contact orders show hostility to religious people and beliefs and thus flunk neutrality. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rts. Comm'n*, 138 S. Ct. 1719,

---

[33] As noted, the parties spend the bulk of their briefing on Claim One. Much of the analysis on that claim would apply equally to the remaining claims. Accordingly, the Court addresses Claim Two and Claim Three in a summary fashion. Neither party has presented briefing or argument on Claim Four for purposes of the instant Motion.

1729–31 (2018); *Lukumi*, 508 U.S. at 534.

Similarly, Defendants issued the no-contact orders to Plaintiffs with almost no due process. While it appears OCRI began a quasi-investigation, they did not provide any of the Plaintiffs with notice of the allegations against them or allow Plaintiffs to respond to the allegations. Frankly, they did not involve Plaintiffs in any meaningful way. Rather, Defendants issued the orders because they were "requested by [Ms. Doe]" and "deemed"—in Defendants' own estimation—"reasonable based on the information presented." Dkt. 1-19, at 2.

In short, Plaintiffs are likely to succeed on their Free Exercise and Due Process Claims as well.

### B. Remaining *Winter* Factors

Neither side spends a great deal of time addressing the remaining *Winter* factors. Both argue that the other three factors follow naturally from their conclusion on the first factor: Plaintiffs in favor of an injunction, Defendants against.

Plaintiffs simply argue they "meet the remaining requirements as a necessary legal consequence" of their successful showing on the merits. *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020).

For their part, Defendants state they are likely entitled to qualified immunity and that the public interest actually weighs in their favor because, were the Court to grant the PI Motion, they would not be able to comply with Title IX and issue no-contact orders in other harassment cases.

First, the Court need not consider qualified immunity at the present time because the PI Motion seeks injunctive relief. *Demers v. Austin*, 746 F.3d 402, 417–18 (9th Cir. 2014).

Second, Defendants' concern about Title IX's efficacy in the event the Court grants the PI Motion is a gross overstatement. In granting the PI Motion today, the Court is in no way prohibiting the University from complying with Title IX or from issuing no-contact orders. When contact between members of the University community poses a threat to physical safety, or is necessary to stop unlawful harassment as defined by Title IX, Defendants likely will have little difficulty meeting their burden—even if First Amendment speech is implicated. However, the Court is making a preliminary finding that Defendants did not ensure that each no-contact order *in this case* was appropriately tailored to their interests, or that their policies provided both substantive and procedural safeguards to not only protect Jane Doe from harassment, but to protect Plaintiffs from unconstitutional restraints on their speech.

The Court finds the remaining *Winter* factors weigh in favor of Plaintiffs.

## VI. CONCLUSION

Demonstrating a likelihood of success on the merits, or "serious questions going to the merits," is the most important element of a preliminary injunction. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). Here Plaintiffs have done that. The Court recognizes that discovery will flesh out the nuances of the competing rights at issue, clarify factual disagreements, and illuminate the University's policies and practices. Nevertheless, the Court finds that Plaintiffs have carried their burden at this time. At this

stage of the proceedings, it is likely Plaintiffs will succeed on their claims due to the targeted and disparate manner in which Defendants chose to regulate Plaintiffs' religious speech.

Again, this is not a Title IX case; this is, among other things, a First Amendment case. And this case is not about Jane Doe; it is about Plaintiffs. The Court, therefore, need not focus on Jane Doe and the University's actions against the backdrop of Jane Doe's rights. Rather, the Court must look at Plaintiffs and the University's actions against the backdrop of Plaintiffs' rights. In so doing, the Court finds Plaintiffs are likely to succeed on their claims.

There is a sad irony in the fact that the restraint on Plaintiffs' speech began at an event meant to reiterate acceptance and tolerance and to dissuade bullying and marginalization. The Court shares law school Dean Johanna Kalb's hope that, at a law school, "classrooms and hallways will be a place of robust discussion and debate" and that "the foundation for all of these discussions [will be] mutual respect and grace." Dkt. 17-14, at 2.

Some may disagree with Plaintiffs' religious beliefs. Such is each person's prerogative and right. But none should disagree that Plaintiffs have a right to express their religious beliefs without fear of retribution. The Constitution makes that clear.

## VII. ORDER

1. Plaintiffs' Motion to Amend/Correct Caption (Dkt. 10) is GRANTED.

2. The Parties' Joint Motion to Treat Amended Verified Complaint as Operative Pleading (Dkt. 18) is GRANTED.

3. Defendants' Motion for Leave to File (Dkt. 20) is GRANTED.

4. Plaintiffs' Motion for Preliminary Injunction (Dkt. 7) is GRANTED.[34]

DATED: June 30, 2022

David C. Nye
Chief U.S. District Court Judge

---

[34] In their PI Motion, Plaintiffs requested that the Court order Defendants to:

1. Rescind the no-contact orders issued to Plaintiffs;
2. Terminate any investigation related to the no-contact orders issued to Plaintiffs based on allegations of protected speech alone;
3. Remove any reference to the no-contact orders and investigations related to the no-contact orders in the University's records for Plaintiffs; and
4. Stop enforcing Policy 2400 and Policy 6100 to restrict or punish speech based on allegations of pure speech alone that does not rise to the level of harassment as defined in Policy 6100 Section D-19(b).

Dkt. 7, at 9. Requests one and three are granted outright. And while the Court will also grant the second and fourth requests, the Court wishes to highlight the qualifying language of "speech alone" (in the second request) and "pure speech alone" (in the fourth request). Nothing in the Court's decision today prohibits an investigation into Jane Doe's allegations—should she choose to pursue one—*assuming* OCRI bases that investigation on things other than "speech alone"/"pure speech," provides due process, and protects Plaintiffs' constitutional rights. In like manner, the University can, and should, continue to enforce its policies, including those based on pure speech, *so long as* the speech meets its definition of harassment.

MEMORANDUM DECISION AND ORDER – 31